**BAY, INC., Appellant,**

v.

**Randy and Rebecca RAMOS, Individually and as Next Friends of Erika and Randy Ramos, Jr., Minor Children, Appellees.**

**No. 04–02–00196–CV.**

Court of Appeals of Texas, San Antonio.

March 24, 2004.

Rehearing Overruled June 24, 2004.

W. Wendell Hall, Rosemarie Kanusky, Fulbright & Jaworski L.L.P., San Antonio, Ben Taylor, Fulbright & Jaworski L.L.P., Dallas, Reagan Wm. Simpson, King & Spaulding LLP, Houston, Darrell L, Barger, Hartline, Dacus, Barger, Dreyer & Kern, P.C., Corpus Christi, for appellant.

Rebecca E. Hamilton, Sumner, Schick & Hamilton, Dallas, Steve T. Hastings, Hastings & Alfaro, Robert J. Patterson, Patterson & Associates, Corpus Christi, Wallace W. Canales, Alice, Ronald G. Hole, Hole & Alvarez, L.L.P., McAllen, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice, DAVID PURYEAR, Justice.[1]

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from a jury verdict in favor of appellees, Rebecca and Randy Ra-

---

1. Justice Puryear sitting by designation of the Texas Supreme Court.

mos, individually, and as next friends of Erika Ramos and Randy Ramos, Jr., minors (collectively, the "plaintiffs"). We reverse and remand.[2]

## I. BACKGROUND

At approximately 8:30 p.m. on a clear and dry September 1997 evening, Rebecca Ramos drove from her home to the home of her parents-in-law to pick up her three-year-old son, Randy Ramos, Jr. Eighteen-month-old Erika Ramos was in the front passenger seat. Upon leaving her in-laws' house, Rebecca placed both children in the front passenger seat and drove back to her house, about a ten minute drive. Rebecca was driving north on Highway 281 in a rented Suzuki compact car.

At about 9:00 p.m., eighteen-year-old Melinda Garcia was driving from the home of her friend and passenger, Gilbert Rea, back to her parents' house. Garcia was driving a Toyota compact car on a road that intersected Highway 281. As Garcia attempted to cross over Highway 281, she collided with the Ramos car. All passengers received minor injuries except Erika, who sustained severe injuries when the passenger-side air bag deployed. Erika's injuries included a broken neck, severed spinal cord, and severe loss of blood and oxygen to her brain.

At the time of the accident, a portion of Highway 281, including the intersection at which the accident occurred, was under construction. The Texas Department of Transportation ("TexDOT") had contracted with Bay, Inc., to perform the construction work.

Following the accident, the plaintiffs and Garcia sued Bay in 1998. Trial commenced in January 2000 and ended with a verdict in favor of the plaintiffs, although the jury apportioned liability forty percent to Rebecca, thirty percent to Garcia, and thirty percent to Bay. The jury awarded $4 million in past and future medical expenses and no other damages to Erika; $10,000 in pain and mental anguish to Randy Jr.; $30,000 each to Rebecca and Randy in past damages for loss of filial consortium; and no damages to Garcia. Plaintiffs moved for a mistrial, which was granted. A second trial commenced in December 2001 and ended with a verdict in favor of the plaintiffs and Garcia. This time, though, the jury found Bay 100% liable and awarded over $62 million (including interest) to the plaintiffs and Garcia. Bay now appeals.

## II. IMMUNITY

■ In its first issue, Bay asserts it is entitled to either sovereign or official immunity because decisions about highway design, traffic control, and the installation of safety features are discretionary functions shielded by the state's sovereign immunity.[3] In issue three, Bay asserts the

---

**2.** On its own initiative, this court has considered this appeal en banc. *See* TEX.R.APP. P. 41.2(c), 49.7.

**3.** Recently, the Texas Legislature has amended chapter 97 of the Civil Practice and Remedies Code. Chapter 97's title has been changed to "Liability of Persons Providing Services for a Governmental Unit." Act of May 9, 2003, 78th Leg., R.S., Tex. H.B. 1699, § 2 (Text available at http://www.capitol.state.tx.us). Section 97.002 has been added to chapter 97, and provides that, "[a] con-

tractor who constructs or repairs a highway, road, or street for the Texas Department of Transportation is not liable for personal injury ... arising from the performance of the construction or repair if, at the time of the personal injury ... the contractor is in compliance with contract documents material to the condition or defect that was the proximate cause of the personal injury...." *Id.* at § 1. The Act amending chapter 97 is effective September 1, 2003 and applies "only to a cause of action that accrues on or after that date." *Id.* § 4.

evidence is insufficient to support a finding that it had control over the defect-producing work at the construction site.

Bay does not contend it is a "governmental unit," or an employee or agent of the State, and it does not deny that it is an independent contractor. Instead, Bay's argument relies entirely on the discretionary function of the State with regard to highway construction. Bay asserts that the State's immunity is not waived for discretionary decisions such as highway design, traffic control, and the installation of safety features, such as guardrails and barricades. Bay contends that TexDOT "dictated" the manner in which Bay would perform its highway construction work for the State. Thus, Bay concludes, because it did no more than follow TexDOT's plans and specifications, it is entitled to share in the immunity enjoyed by the State and its agencies such as TexDOT.

■ Bay and TexDOT entered into a contract that included a traffic control plan, which indicates the locations of signs, barricades, and concrete traffic barriers. The traffic control plan provided that "[t]he contractor shall provide for safe and convenient access to abutting property, highway, public road, and street crossings." The terms of the State's "Standard Specifications for Construction of Highways, Streets and Bridges" (also commonly known as the "blue book") were incorporated into the contract between TexDOT and Bay, and provided as follows:

> Temporary approaches and crossings of intersecting highways shall be maintained in a safe and passable condition by the Contractor at his expense.

> \* \* \*

> The safety of the public and the convenience of traffic shall be regarded as of prime importance. Unless otherwise shown on plans or except as herein pro-

vided, all portions of the highway shall be kept open to the public. It shall be the entire responsibility of the Contractor to provide for the traffic along and across the highway, as well as for ingress and egress to adjacent property, in accordance with the traffic control plan and detours as shown on the plans and in the specifications for the project or as directed/approved by the Engineer.

> \* \* \*

> The Contractor shall plan and execute his operations in a manner that will cause the minimum interference with traffic. The contractor shall secure the Engineer's approval of his proposed plan of operation and sequence of work. If at any time during construction the approved plan does not accomplish the intended purpose due to weather or other conditions affecting the safe handling of traffic, the Contractor shall immediately make necessary changes as directed/approved by the Engineer therein to correct the unsatisfactory conditions.

In construing similar language in the contract between a road company and the State, the Texas Supreme Court noted that such "[safety] provisions place a broad duty on contractors to provide for the safety of the public within the area under construction." *Strakos v. Gehring*, 360 S.W.2d 787, 795 (Tex.1962). Thus, a contractor performing construction work on a public highway has a duty to exercise ordinary care to protect travelers who are rightfully using the highway. *See Strakos*, 360 S.W.2d at 795, 803–04; *Ross Anglin and Son v. Brennan*, 466 S.W.2d 832, 833 (Tex.Civ.App.-Austin 1971, no writ); *Wedegartner v. Skoruppa*, 236 S.W.2d 216, 218 (Tex.Civ.App.-San Antonio 1951, no writ); *Overstreet v. McClelland*, 13 S.W.2d 990, 992 (Tex.Civ.App.-Amarillo 1928, writ dism'd w.o.j.).

■ However, to recover against a general contractor for a premises defect, the injured plaintiff must establish the general contractor's right to control the defect-producing work. *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex.1997); *Lyons v. Lindsey Morden Claims Mgmt., Inc.*, 985 S.W.2d 86, 90–91 (Tex.App.-El Paso 1998, no pet.); *Gonzalez v. Heard, Goggan, Blair & Williams*, 923 S.W.2d 764, 766 (Tex.App.-Corpus Christi 1996, writ denied). "Control" means "power or authority to guide or manage." *Rendleman v. Clarke*, 909 S.W.2d 56, 60 (Tex. App.-Houston [14th Dist.] 1995, writ dism'd as moot) (*quoting* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 285 (9th ed.1991)). Bay asserts the key consideration is who controlled the barricades at the intersection because the barricades are the only aspect of the construction site that could have contributed to the accident based on Garcia's testimony. Bay contends the evidence is undisputed that TexDOT dictated to Bay where and how to erect the barricades, and Bay was not allowed to move the barricades until instructed to do so by TexDOT. According to Bay, it was required to follow TexDOT's traffic control plan as shown on the plans and specifications for the project.

In *K.D.F. v. Rex*, 878 S.W.2d 589 (Tex. 1994), the Supreme Court had to determine whether two private companies were subject to Texas jurisdiction, a determination that rested on whether a Kansas state entity exerted any control over the companies. The Court first engaged in a comparison of Texas sovereign immunity law and Kansas sovereign immunity law:

> Thus, in either state, indirect liability on the part of the state will arise from the performance of ministerial functions by a state employee under the control or direction of the state, and not from (1) discretionary acts of the employee, (2) acts of independent contractors, or (3) intentional, grossly negligent, fraudulent, or malicious conduct by the employee. We think it is reasonable to hold that K.D.F. and Pacholder [the two private companies] can benefit "indirectly" from the sovereign immunity of Kansas, subject to these same principles. Therefore, an agent of KPERS [the governmental entity] will not be subject to Texas jurisdiction in an individual capacity for performing essentially ministerial functions under the control and direction of KPERS.

878 S.W.2d at 597.

The Court then examined the roles of each company and the control, if any, exerted over the company by the government:

> K.D.F. operates solely upon the direction of KPERS, and exercises no discretion in its activities. For jurisdictional purposes, we hold that K.D.F. and KPERS are not distinguishable from one another; a lawsuit against one is a lawsuit against the other.
>
> Pacholder, however, is an Ohio corporation that serves as an investment advisor to KPERS. Pacholder operates as an independent contractor. Its activities necessarily involve considerable discretion. Thus, its role is more in the nature of advising KPERS how to proceed, rather than being subject to the direction and control of KPERS.... Pacholder is not entitled to sovereign immunity protection unless it can demonstrate its actions were actions of the Kansas government, executed subject to the control of KPERS.

*Id.* The Supreme Court concluded that "While sovereign immunity protects the activities of government entities, no sovereign is entitled to extend that protection *ad infinitum* through nothing more than private contracts." *Id.* (emphasis in origi-

nal). We follow a similar analysis here in determining whether the evidence is sufficient to support a finding that Bay controlled the condition of the construction site at the time of the accident.

Plaintiffs' expert, David Steitle, a traffic engineer, explained that a traffic control plan is a layout of temporary traffic control devices and sets forth the minimum requirements with which the contractor must comply. Rocky Eyler, Bay's project manager on the Highway 281 construction project, said Bay set up the construction zone as specified by TexDOT. Howard Kovar, vice president of Bay's highway division, testified that questions about the traffic control plan would be directed to the TexDOT inspector or engineer, and although Bay had the responsibility to bring any hazards to TexDOT's attention, Bay did not have authority to make any unauthorized changes to the traffic control plan. Kovar said that after a traffic control plan is in place, the TexDOT inspector or engineer and a Bay employee inspect the plan in place. According to Kovar, Bay relied on TexDOT to ensure the safety of motorists.

Mario Garza, the TexDOT director of the district construction office, agreed that TexDOT produces a traffic control plan and expects contractors to comply with the plan. He said a contractor is responsible for installing and maintaining the plan. A "blue book" of specifications is part of every contract with contractors such as Bay, and contractors must comply with this book. Pursuant to the requirements of the blue book, Garza said TexDOT expects contractors to maintain road crossings in a safe manner, and if the traffic control signs are erected in an unsafe manner, he would expect the contractor to correct the problem.

Garza said TexDOT relies on the contractor to review the traffic control plan once it is in place and determine whether the plan is workable and safe. If an inspection is necessary or if there is a safety concern, the contractor is expected to perform its own independent inspection. The contract with TexDOT requires two inspections, one during the day and one at night. The inspections are conducted once a month, two weeks apart. Garza stated the contractor is expected to conduct its own inspections at any time.

Garza said a contractor has overall responsibility for safety on a project and must provide a safe construction zone for the public day and night. If something minor is needed, such as additional barrels or signs, the contractor may make the change without TexDOT's approval. If a major change to the traffic control plan is required, the contractor must request the change in writing to TexDOT, and the area TexDOT office may order a change for safety reasons as soon as is necessary. However, the contractor has the authority to do whatever is necessary to eliminate a hazard, and if the contractor receives a complaint about a situation that presents a hazardous condition, the contractor may take immediate corrective action. Garza said if there is a safety concern with barriers, the contractor should move the barriers immediately and then consult with TexDOT.

Eyler testified that responsibility for traffic safety was shared by TexDOT and Bay, but Bay was required to follow the traffic control plan. He said he was not required to perform traffic control inspections and no one had told him to perform any inspections at night. Eyler did not realize the barriers caused a visibility problem at night, but if he had known he would have notified TexDOT. Although the contract called for a day and night inspection and two inspections were performed during the day, no night-time in-

spection was performed before the accident. Although two witnesses for the plaintiffs testified they complained to someone at the construction site about visibility problems at this intersection, Eyler said Bay had no record of any complaints. Eyler was not aware of the Ramos accident or an accident that occurred at the same intersection the following weekend until he was informed by a TexDOT engineer.

Steitle testified that a contractor supervises and manages the project, while TexDOT oversees the work. He stated it was not TexDOT's responsibility to ensure the public's safety at an intersection, and a contractor is responsible for recognizing if an implemented traffic control plan is not safe. He agreed that a traffic control plan provides only minimum requirements and a contractor is responsible for providing additional effort to ensure the safe movement of traffic in a construction zone. Steitle admitted a traffic control plan must be modified with TexDOT's approval; however, he also stated a contractor could make immediate changes to avoid any hazards. As to obtaining written approval from TexDOT before modifying the plan, Steitle said that Bay did not obtain approval every time it moved a barricade and Bay had the discretion to position a barricade in a manner that did not obstruct visibility.

No one disputes that TexDOT provided the traffic control plan or that Bay was required to comply with the plan. No one disputes that Bay had to obtain TexDOT's approval to deviate in any significant way from the plan. Nevertheless, according to a TexDOT representative and a Bay employee, Bay had an obligation to maintain the safety of the construction site; inspect the site to ensure that the traffic control plan, as outlined on paper, was safe once it was in place; and to make any immediate

changes as called for by the circumstances. We hold the evidence is sufficient to support a finding that Bay had control over the placement of the barriers, signs, and barricades when the traveling public's safety was at issue.

Merely because Bay engaged in an activity that is highly regulated by a state agency does not necessarily place it under that agency's control and direction for purposes of the Texas Tort Claims Act. *See Rodriguez v. Texas Dept. of Mental Health and Mental Retardation,* 942 S.W.2d 53, 56–57 (Tex.App.-Corpus Christi 1997, no writ). And, courts should be "careful not to extend the blanket of sovereign immunity to every entity which at first blush exhibits the characteristics of a governmental unit." *Alamo Workforce Dev., Inc. v. Vann,* 21 S.W.3d 428, 433 (Tex.App.-San Antonio 2000, no pet.). Because Bay's own activities involved considerable discretion, it had control over the barricades. Accordingly, Bay was not entitled to either sovereign or official immunity.

## III. NEGLIGENCE OF REBECCA RAMOS AND MELINDA GARCIA

In its third issue, Bay asserts the evidence is legally and factually insufficient to support findings that it was negligent, while neither Rebecca nor Garcia were negligent. Because our disposition of this issue as to Rebecca is dispositive, we do not address whether the evidence is sufficient to support a finding of no negligence on the part of Garcia.

### A. Standard of Review

In considering a "no evidence" or legal sufficiency challenge raised by the party that did not have the burden of proof at trial, we consider only the evidence favorable to the decision of the trier of fact and

disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If more than a scintilla of evidence is offered on a fact, the evidence is legally sufficient. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). In considering a factual sufficiency challenge raised by the party that did not have the burden of proof at trial, we conduct our review by considering all the evidence in the record both for and against the finding. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We can find the evidence factually insufficient only if we conclude the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.*

When the party who had the burden of proof at trial complains of the legal insufficiency of an adverse finding, that party must demonstrate the evidence establishes conclusively (*i.e.,* as a matter of law) all vital facts in support of the finding sought. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). We first examine the record for evidence supporting the adverse finding, ignoring all evidence to the contrary. *Id.* If more than a scintilla of evidence supports the adverse finding, our inquiry ends. *Id.* "More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995) (citations omitted). If there is no evidence to support the finding, we next examine the entire record to determine if the contrary proposition is conclusively established. *Dow Chem. Co.,* 46 S.W.3d at 241. We will sustain the issue if the contrary proposition is conclusively established. *Id.*

When the party who had the burden of proof at trial complains of the factual insufficiency of the evidence, that party must demonstrate that the adverse finding is contrary to the great weight and preponderance of the evidence. *Dow Chemical Co.,* 46 S.W.3d at 242. We weigh all the evidence, and will set aside the adverse finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* In doing so, we must detail all the evidence relevant to the issue and state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986). We must explain how the contrary evidence greatly outweighs the evidence supporting the verdict. *Maritime Overseas Corp.,* 971 S.W.2d at 407; *Pool,* 715 S.W.2d at 635.

## B. Rebecca Ramos

■ Bay had the burden of proof on the issue of Rebecca's negligence, and it relies on the fact that Rebecca admitted she allowed Erika and Randy Jr. to ride in the front passenger seat of the car for the drive from the home of Rebecca's parents-in-law to the Ramos home.[4]

---

4. Plaintiffs allege Bay's counsel stipulated that Rebecca did nothing wrong. We disagree with this contention. Although one of the plaintiffs' experts opined that Rebecca was not negligent, Bay did not concede Rebecca did nothing wrong. In fact, during voir dire, Bay's counsel stated as follows:

[W]e have no complaint about the driving of Mrs. Ramos.... [W]e are not complaining about him [sic] driving, but I am going to talk to you a moment about what I think the evidence is going to show about what she did with the children as to what caused the injuries, but not her driving.

The remainder of counsel's argument also makes clear that Bay placed blame on Rebecca for how she positioned the children in the car.

Rebecca was driving a rented Suzuki compact car, which she had driven only once before the accident. She did not understand what an air bag could do. The posted speed on the freeway was fifty miles per hour; however, Rebecca was driving approximately forty miles per hour before the collision. She said she did not see Garcia's car until it was too late, and she swerved her car in an attempt to avoid a collision. Rebecca said that if the stop sign and barrels along the freeway had been in a different position, she would have seen Garcia's car in time to avoid the collision. This evidence is legally sufficient to support the jury's finding that Rebecca was not negligent.

■ However, we believe the evidence is factually insufficient. On the issue of negligence, the jury was instructed as follows:

As to negligence, if any, of Melinda Garcia and Rebecca Ramos, apply the following definitions. "Negligence" means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. "Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

The accident occurred at night, on a freeway, and Rebecca was driving approxi-mately forty miles per hour. The jury heard the following testimony, from Rebecca, regarding the position of the children in the car:

Q. And what you did is you put them both in the right front seat; you positioned them in the right front seat, right?

A. Yes.

Q. All right. Without going into detail, you knew, as a mother with a one-year-old baby, that the best position for Erika was in the back seat of the car, right?

A. Yes.

Eugene Farber, plaintiffs' "human factors" expert, testified that Erika's injuries were caused by the air bag's deployment. Farber also agreed with counsel that positioning of an infant child "is very, very important for the safety of that child."

Although Rebecca was only twenty-one years old at the time of the accident, she knew the best position for a child as young as Erika was in the back seat of the car. Despite this knowledge, she placed, not one, but two children in the front seat of a compact car and then drove, at night, on the freeway. Because Erika was in the front passenger seat, she was injured when the air bag deployed. The evidence that Rebecca's actions caused, or contributed to, Erika's injuries outweighs any finding of *zero* responsibility on Rebecca's part for those injuries.[5] Therefore, a finding that Rebecca was not negligent is manifestly unjust.[6] Our conclusion that

5. The jury did not hear evidence on whether Erika and Randy Jr. were properly restrained, and our analysis does not take such evidence into consideration. Instead, our focus is on the evidence which establishes that Rebecca, despite her knowledge, placed two small children in the front seat of a compact car and then drove with those children on a freeway at night.

6. Our holding should not be read as inconsistent with the present state of the law that the failure to wear a seatbelt is not evidence of contributory negligence. *See Bridgestone/Firestone, Inc. v. Glyn–Jones*, 878 S.W.2d 132, 134 (Tex.1994); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633 (Tex.1986); *Carnation Co. v. Wong*, 516 S.W.2d 116, 117 (Tex.1974) (per curiam); *see also* TEX. TRANSP.

the evidence is factually insufficient to support the jury's answers to the negligence question and, implicitly, the proportionate responsibility questions, requires that we reverse the judgment in favor of both Rebecca and Garcia.

## IV. NEW TRIAL

In its ninth issue, Bay asserts the trial court erred in granting a new trial after the first verdict. A trial court's order, rendered during its plenary power, granting a new trial is not reviewable by direct appeal or from a final judgment rendered after further trial court proceedings. *Cummins v. Paisan Constr. Co.*, 682 S.W.2d 235, 235–36 (Tex.1984); *Volkswagen of America, Inc. v. Ramirez*, 79 S.W.3d 113, 128 (Tex.App.-Corpus Christi 2002, pet. granted); *Otis Spunkmeyer, Inc. v. Blakely*, 30 S.W.3d 678, 683 (Tex. App.-Dallas 2000, no pet.); *Vandehaar v. ALC Fin. Corp.*, 25 S.W.3d 406, 410 (Tex. App.-Beaumont 2000, pet. denied); *Dillard v. Leonard*, 801 S.W.2d 23, 25 (Tex.App.-San Antonio 1990, no writ); *see also In re Bayerische Motoren Werke, AG*, 8 S.W.3d 326, 328 (Tex.2000) (Hecht, J. dissenting). Also, the Supreme Court has twice denied petitions for writs of mandamus in proceedings in which the issue was whether a trial court should be required to explain its ruling when granting a new trial. *See In re Volkswagen of America, Inc.* 22 S.W.3d 462 (Tex.2000); *In re Bayerische Motoren Werke, AG*, 8 S.W.3d at 326.

We note that the Supreme Court has recently heard oral arguments in *Volkswagen of America, Inc. v. Ramirez*, in which the issue of whether an order granting a new trial is reviewable on direct appeal has been raised. However, until the Supreme Court holds otherwise, we hold that Bay is not entitled to review of the trial court's order granting plaintiffs' motion for mistrial following the first verdict.

## CONCLUSION

We hold that Bay is not immune from liability and it is not entitled to review of the order granting plaintiffs a mistrial. However, because the evidence is insufficient to support a finding that Rebecca Ramos was not negligent, we reverse the trial court's judgment in its entirety and remand the cause for further proceedings. We do not address the remaining issues because they are not necessary to the final disposition of this appeal. *See* TEX.R.APP. P. 47.1.[7]

Concurring and dissenting opinion by CATHERINE STONE, Justice; joined by Chief Justice ALMA L. LÓPEZ and Justice PHYLIS J. SPEEDLIN.

CATHERINE STONE, Justice, concurring and dissenting.

At approximately 8:30 p.m. on the evening of September 27, 1997, Rebecca Ramos seated her two sleepy young children in the front seat of a car for a quick trip home from their grandparents' house.

---

CODE ANN. § 545.413(g) (Vernon Supp.2003) (providing "[u]se or non-use of a safety belt is not admissible evidence in a civil trial"). In its fourth issue on appeal, Bay complains that the exclusion of evidence that Rebecca failed to properly restrain her children violates its due process rights under both the Texas and federal constitutions. Because we sustain Bay's complaint that the evidence of Rebecca's negligence outweighs any finding of no responsibility on her part and that such a

finding is manifestly unjust, we do not address Bay's fourth issue.

7. Bay's assertion on appeal that Texas does not recognize a claim for loss of filial consortium damages has been rendered moot by the Texas Supreme Court's recent decision in *Roberts v. Williamson*, 111 S.W.3d 113, 120 (Tex.2003).

The car, a rental vehicle that Rebecca had driven only one other time, was equipped with air bags. Within a few minutes of her journey, Rebecca was involved in an automobile accident that all parties agree was not caused by Rebecca in any way. At the ensuing trial, Rebecca testified that she did not understand what an air bag could do upon deployment. She also testified, however, that she knew the best place for her young children was in the back seat of the car. A jury in Jim Wells County heard this testimony and determined that Rebecca was not guilty of negligence that "proximately cause[d] the occurrence or injury" to her children. The majority concludes that "evidence that Rebecca's actions caused, or contributed to, Erika's injuries outweighs any finding of zero responsibility on Rebecca's part for those injuries." *Op.* at 330. I respectfully dissent from this conclusion.

As to Rebecca, the jury was told that " 'Negligence' means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." The jury was also instructed that proximate cause "means that cause which, in a natural and continuous sequence, produces an event, and without which such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom."

The record contains no evidence that Rebecca was legally obligated to place her young children in the back seat of the car. Nor is there any evidence that in 1997 a person of ordinary prudence would not

have placed two young children in the front seat of a car, or that in 1997 a person of ordinary prudence would have foreseen that the failure to place children in the back seat would or could lead to the type of devastating injuries suffered by Erika. The jury determined that Rebecca was not negligent, and although we may sharply disagree with the jury's conclusion, based on this record, we are not free to disregard their conclusion. *See Cruz ex. rel. Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 646 (Tex.App.-El Paso 2001, pet. denied)(refusing to sit as thirteenth juror); *Gainsco County Mut. Ins. Co. v. Martinez*, 27 S.W.3d 97, 108 (Tex.App.-San Antonio 2000, pet. dism'd by agr.)(same). For this reason, I respectfully dissent from the portion of the majority opinion and judgment which reverses and remands the cause for a new trial. I concur in all other regards.