Opinion issued February 10, 2011

 



 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

­­­­­­­­­­



 

NO. 01-08-00148-CV

 



 

RELIANT ENERGY
SERVICES, INC., Appellant

 

V.

 

COTTON VALLEY COMPRESSION,
L.L.C., Appellee

 

 

and

 

 

COTTON VALLEY COMPRESSION,
L.L.C., Appellant 

 

V.

 

RELIANT ENERGY
SERVICES, INC., Appellee

 

 

 



On Appeal from
the 151st District Court

Harris County, Texas

Trial Court Cause No. 2002-08521

 

 



O P I N I O N

Cotton
Valley Compression, L.L.C. (“Cotton Valley”) brought a breach‑of‑contract
action against Reliant Energy Services, Inc. (“Reliant”) based on theories of
actual and apparent agency by a third-party, Westfield Oil & Gas, Inc.
(“Westfield”).[1]  The jury found in favor of Cotton Valley on
both theories of agency and rejected Reliant’s affirmative defense of
quasi-estoppel.  Thereafter, the trial
court rendered judgment against Reliant on the jury verdict under the theory of
apparent authority but granted Reliant’s motion for judgment notwithstanding
the verdict on the theory of actual authority.

Both
parties appealed—Reliant on issues of apparent authority and its affirmative
defense of quasi-estoppel; Cotton Valley on the trial court’s judgment
notwithstanding the verdict on an issue of actual authority.  We determine whether (1) there was legally‑
and factually‑sufficient evidence to support the issue of apparent
authority, (2) whether there was legally‑sufficient evidence to support
the jury’s verdict on the issue of actual authority and whether the subsequent
judgment notwithstanding the verdict should be reversed, (3) whether Reliant
proved its affirmative defense of quasi-estoppel as a matter of law, (4)
whether Reliant preserved complaints regarding the admission of certain
evidence, and (5) whether the trial court erred in not granting Reliant a new
trial in the interest of justice.

We affirm.

Background

A.      Westfield
and Reliant

          Ernie Gouge
founded and was sole owner and president of the Houston‑based Westfield
Oil and Gas[2], a
small natural gas-trading company comprised of no more than three employees,
occasional contract workers, and several associates who helped bring in
business.  From 1998 to 2001, Westfield
had no gas‑storage facilities, no pipeline, no transportation contract
with any pipeline,[3]
and no one acting as a scheduler in dealing with a pipeline.[4]

Gouge and his
associates had a talent for identifying production fields, establishing
relationships with gas producers, and aggregating significant volumes of
gas.  In the mid-1990s, his company began
aggrevating or pooling gas from several producers specifically for delivery to
Reliant. Reliant relied upon gas‑trading companies like Westfield for
acquisitions from small independent producers in certain regions.

          In 1995,
Westfield signed a base contract with Reliant[5]
to supply natural gas to Reliant. Westfield and Reliant additionally had a
number of unwritten agreements relating to their arrangement, including:

–one
permitting Westfield to utilize Reliant’s accounting and scheduling staff and
to rely on Reliant’s transportation contracts with pipelines rather than
purchasing its own; 

–that
Reliant would pay Westfield earlier than the contract required (“prepays”) for
gas that had already been received;[6]


–a
“gentleman’s agreement” that Reliant would take all the gas that Westfield
could aggregate and Westfield would sell to no one else; and

–agreements
that Westfield could “play the gas” (receive a profit based on the daily price
of gas) when Reliant had directly contracted for gas with certain producers[7]
brought to Reliant by Westfield acting as its agent.

          Because Westfield and Reliant often
made verbal agreements, the written contract between them did not fully explain
their relationship.  Further,
Westfield—with Reliant’s knowledge—routinely used Reliant’s name as Westfield’s
“calling card” to find producers, a practice Reliant later directed Westfield
to stop.[8]  The Reliant name provided Westfield
credibility with the producers.  Although
it was unusual for an independent gas marketer to disclose the name of its buyer
to the producer and risk that producer selling directly to the buyer, Gouge was
unconcerned about disclosing Reliant’s status as the buyer because of his long
association with Reliant and the “gentleman’s agreement” between them.  Once Westfield had arranged for delivery of
the gas, it was not involved in the actual transfer of the gas from the
producer to Reliant.  Reliant worked
directly with the producers in executing the transactions required by the
transporting pipeline for the transfer of title to the gas, known as
nominations.  Under this method, as far
as the pipeline data system was concerned, physical possession of the gas
passed directly from the producers to Reliant; Westfield never physically
possessed it.

B.      The “Deal”
for Cotton Valley’s Gas 

          1.       The Initial Contacts and Discussions

          In early
1999, Westfield sought to expand into Oklahoma. 
In March, Gouge wrote a letter to his then-contact at Reliant, Pat
Strange, expressing his desire to acquire gas from certain Oklahoma producers,
including Cotton Valley, and asked for Reliant’s assistance.

Cotton
Valley was a cooperative comprised of several local northeastern Oklahoma
independent natural‑gas producers that joined together to build a gas‑compression
station[9]
and to market and sell the cooperative’s gas. 
In 1999, it had two employees—John Eakin, the general manager, and Pam
Brown, the assistant manager—and its office was located in Bartlesville,
Oklahoma.  Brown handled all the
day-to-day operations, including selling the gas and inputting nominations into
the system. 

Prior to
the sending of the March 1999 purchase agreement, one of Gouge’s associates,
Ben Campbell, called Brown at Cotton Valley and told her that Westfield was
seeking natural gas in the Oklahoma/Texas area “for [Reliant].”  Cotton Valley was later contacted by Gouge,
who told Eakin and Brown that he was gathering gas for Reliant and could offer
Cotton Valley a “bonus” or premium over the market price.  He explained that Reliant would take
possession of the gas at Cotton Valley’s receipt points[10]
by accepting nominations at that point.  Once
the gas passed through the meter, was measured, and got into the pipeline
system, it was Reliant’s gas.  Reliant
would pay the pipeline’s charges to transport the gas to the Cotton Valley
compression station, and then pay the pipeline’s charges to transport the gas
to the market zone.[11]  Cotton Valley would confer directly with Reliant’s
scheduling department to give them Cotton Valley’s nominations; Reliant would
then put the nominations into the database system to pick up the gas and would place
money to pay for the gas directly into an escrow account which had been set up
at Bank One by Westfield.  The purpose of
the escrow account was to ensure that the producers were paid before Gouge took
any excess money out of the account. 
Gouge told Cotton Valley that (1) Westfield was gathering gas for Reliant,
(2) Westfield and Reliant had “some kind of relationship,” (3) Westfield could
pay a bonus or premium over the market for the gas because of that
relationship, (4) Cotton Valley would be delivering the gas directly to Reliant,
(5) Westfield could set up an escrow account where cash would come directly
from Reliant, and (6) Cotton Valley would be paid by the 25th of each month,
every month.  Cotton Valley believed that
it was going to be in business with both Westfield and Reliant, with Westfield
operating as the “gas aggregator” or “middleman” for Reliant, but Westfield
itself never receiving title to the gas. 
It was significant to Cotton Valley that Reliant was getting the gas
because Reliant was a major company, so Cotton Valley did not anticipate having
credit issues in the transaction.  Eakin
called a reference for Westfield, John Alden at Swift Energy, who spoke well of
Westfield.  Neither Eakin nor Brown
contacted anyone at Reliant before Cotton Valley agreed to the deal with
Westfield, nor did they request Westfield’s financial statements.  Apart from the fact that there was one,
Cotton Valley did not know any particulars of the relationship between
Westfield and Reliant and never sought clarification on this point from
Reliant.

          2.       The March 31, 1999 Purchase Agreement

Cotton
Valley signed a purchase agreement with Westfield on March 31, 1999 for the
sale of gas from April 1 through April 30, 1999, with Cotton Valley listed as
seller and Westfield as the buyer. Gouge signed for Westfield and Eakin signed
for Cotton Valley.  The agreement made no
specific reference to Reliant, but Cotton Valley believed Reliant was involved
because Reliant was taking possession of the gas at the pick-up points and making
payment through the escrow account.  The
agreement recited that “Westfield’s purchaser” would “pay direct” to the escrow
account.

According
to Gouge, the agreement was intended to be an “evergreen” contract,
automatically renewing each month unless one party cancelled by giving 30 days
notice, but the March 31, 1999 purchase agreement contained no such language.  There was no other written contract between
Westfield and Cotton Valley and none for the July 2001 gas at issue.  There was no written or verbal agreement
between Cotton Valley and Reliant, and Reliant never made any representations
to Cotton Valley, either verbally or in writing, that suggested that Westfield
was acting on Reliant’s behalf. 
Nevertheless, Cotton Valley felt that Reliant’s actions over the period
of the arrangement confirmed that Westfield and Reliant were working together
to acquire Cotton Valley’s gas for Reliant.

          3.       The Day-to-Day Operations of the Arrangement

                   a.
      Communications and Points of Contact

In selling
gas, Cotton Valley would establish a gas‑trader relationship, reaching an
agreement with the gas trader as to price, volume, and location for “pick up.”  This person was the one with whom the sale
was made and was the first major contact between a buyer and Cotton Valley.  In the transactions regarding the sale of
natural gas at issue, Cotton Valley dealt with Westfield as the gas
trader.  Cotton Valley’s second point of
contact was with a scheduler; without a scheduler, an entity could not purchase
Cotton Valley’s gas.  In this case, Cotton
Valley always dealt directly with Reliant’s schedulers, usually Lee Ann
Brubaker.  The final point of contact was
with the accounting department in order to send the invoice and to collaborate
regarding payment; Cotton Valley dealt with both Westfield’s and Reliant’s
accounting departments, calling Reliant’s accounting department occasionally to
make inquiries about payment when payments were not timely made.

                   b.      Transfer of Gas

The actual
transfer of gas took place through the process of nominations to the Williams
pipeline.  According to Gouge, each month
Brown would fax Gouge a sheet showing the volumes that Cotton Valley would have
available and Gouge would use those totals to make a verbal nomination to David
Dunnavant [12]
at Reliant, who would then pass it on to his gas‑control people.  Verbal nominations were later followed up
with hard copies of the nominations.

Cotton
Valley sent its actual nominations to Brubaker at Reliant.  The nominations included information which
Reliant needed to be able to pick up the gas. 
Originally, the nominations to Brubaker included the price information
for the contract price of the gas as paid to Cotton Valley by Westfield.  This information was later deleted from the
original nominations sent to Brubaker after Brown learned that Reliant paid a
different price for the gas.

Cotton
Valley made its first nomination to Reliant on the same day that the sole
purchase agreement was signed between Cotton Valley and Westfield, March 31,
1999.  Brown faxed the nomination to
Brubaker, Reliant’s scheduler, providing the amount of mmBtus[13]
per day that Cotton Valley was going to be putting into the pipeline and where
they could be received, so that Reliant could then submit a nomination into the
Williams pipeline database to “pick up” the listed mmBtus at the receipt points.  Reliant “picked up” the gas for April and
deposited the money for the gas in the escrow account in May.  This process was repeated for the rest of the
time that Cotton Valley delivered gas to Reliant.  Because the gas was actually “picked up” by
Reliant, the monthly pipeline allocation documents ( “the Quapaw receipts”)
issued by the Williams pipeline that indicated the volumes of gas nominated
versus the amount of gas that actually flowed into the pipeline at the Cotton
Valley’s receipt point showed that Reliant picked up the gas from Cotton Valley,
not Westfield. 

In the
beginning of the arrangement, Cotton Valley only sent the nominations to
Reliant, but later Gouge requested that a copy be sent to him at Westfield
because he wanted to be kept “in the loop.” 
The copy sent to Gouge was only a carbon copy and did not mean that
Westfield could pick up the gas.  The
system did not permit two different nominations for the same gas to two
different people, and Westfield had no ability to pick up the gas because it
had no relationship with the pipeline and no scheduler.

                   c.
      Billing and Payment

          Before the
nominations were sent, Brown would negotiate with Gouge regarding the price and
volume of gas to be sold.  Westfield and
Cotton Valley would agree on a standard price based on a monthly price known as
an “Inside FERC”[14]
basis, along with an additional premium, a small additional amount, such as a
penny, except when additional production was brought on the line, which production
was priced at a “Gas Daily”[15]
price.  Any discussions about price took
place between Westfield and Cotton Valley prior to the gas actually flowing and
the nominations being sent.

Cotton
Valley would wait for the pipeline to “balance the system”[16]
within eight days and then invoice Westfield.  On the 25th day of the following month, it
would get paid for the previous month’s gas. 
Cotton Valley had been asked not to send invoices to Reliant directly
because of the arrangement that Westfield had with Reliant, but instead to send
them to Westfield, which it did.  Cotton
Valley never invoiced Reliant. The invoice often, but not always, included a
signature‑confirmation line for Gouge to authorize a pay-out to Cotton
Valley via wire transfer for the invoiced amount from Westfield’s escrow account.  On four occasions, Westfield wired a portion
of the payment owed to Cotton Valley from a separate Wells Fargo account owned
by Westfield, rather than the Bank One escrow account.  The Bank One escrow account was not
specifically set up for Cotton Valley, but had existed for a number of years,
and had been set up for Swift Energy.  Cotton Valley knew that Swift Energy was also
being paid from the account, but did not know the exact arrangement or what
priority Swift had on the account, though Cotton Valley presumed that Swift
Energy would be paid first because it had the arrangement first. 

The amount
paid by Reliant for the gas was not the same price paid by Westfield to Cotton
Valley for the gas.  Cotton Valley was
not aware of the price that Reliant paid for the gas and never asked Reliant to
pay Cotton Valley directly prior to July 2001. 
The price that Cotton Valley received for the gas was usually a fixed
price of “Inside FERC” plus a premium. The price that Reliant paid for the gas
was based on a variable or daily price—sometimes higher than Cotton Valley’s
price and sometimes lower.[17]  Each month, Gouge would propose a price to
Reliant for the gas that would flow to Reliant the following month.  Reliant and Westfield then would negotiate
and come to an agreement on the price and Westfield would invoice Reliant after
the gas had been received by Reliant.  When
Reliant’s price was not higher than Cotton Valley’s, Westfield made no money on
the gas.  Generally, when the market
dropped, a broker could take the gas and sell it to the highest bidder, but
Westfield could not do so because of its “gentleman’s agreement” with
Reliant.  When Westfield lost money, it
would use cash reserves; if it had none, Reliant would advance money to
Westfield for gas already received, but whose payment was not yet due, in what
was known as an “early pay.”

 

C.      Issues with Payments and
Gas Transfers from May 1999 through July 2001

 

1.       The May
1999 “Refund” Check to Reliant

In May
1999, Brown sent two invoices to Westfield for gas delivered to Reliant, one
for a larger amount and one for a smaller amount, for two separate volumes of
gas that flowed in the same month. 
Cotton Valley was paid on both invoices. 
Brown later mistakenly thought that Cotton Valley had been overpaid and,
seeking to refund the “overpayment,” sent a letter to Reliant along with a
check refunding the smaller amount to Reliant directly.  When Cotton Valley later realized that there
had been no overpayment, a stop-payment order was placed on the check.  Brown informed Brubaker of the confusion about
overpayment and the stop-payment order on the check.  Brubaker thanked Brown for the information,
but did not ask Brown why Cotton Valley had sent Reliant the check nor indicate
that the money should have gone to Westfield.

2.       The
February 2000 Proposed Escrow Agreement and the December 2000 Addendum to the Trust
Agreement

 

          In February
2000, Cotton Valley asked Westfield to sign an escrow agreement that would
ensure that Cotton Valley would be paid from the escrow account before Gouge
took any funds from the account.  Robert
Kane,[18]
one of the owner-producers of Cotton Valley and a practicing lawyer, reviewed
the draft escrow agreement before it was sent to Gouge.  The draft agreement—which defined Cotton
Valley as the seller, Westfield as the buyer, and Bank One as the agent—stated
that on February 1, 2000,[19]
Cotton Valley and Westfield had entered into a gas purchase and sales agreement
under which Cotton Valley agreed to sell and deliver gas to Westfield, Westfield
agreed to sell and deliver gas to Reliant, and Reliant agreed to purchase gas
from Westfield.  Reliant was not listed
as a party to the draft agreement, but was defined in the document as
Westfield’s “resale customer.”  The
agreement also stated that Cotton Valley and Westfield had asked Bank One to
receive payment from “the Resale Customer” (Reliant) for gas purchased by Reliant
from Westfield, and provided that Bank One would disburse those funds as
provided by the agreement.  The document
was already signed by Eakin on behalf of Cotton Valley when it was sent to
Gouge for his signature and for a signature by a representative of Bank One,
but the document was never executed. 

Eakin was
anxious to get the addendum signed by Gouge, and Brown continued to contact
Gouge about signing the addendum for several months.  Finally, in October 2000, Brown sent a fax to
Gouge informing him that Eakin had told her to “only sell half our gas
production to you for the month of November 2000, or until we can get a signed
contract with you and a bank.”  In
November, Cotton Valley sold some of its production to another company in an
effort to put pressure on Gouge to sign. 
In December 2000, Gouge signed an addendum to the trust account that
provided that direct disbursements would be made to Cotton Valley and that no
money would be paid to Westfield until after such disbursements were
complete.  Bank One and Cotton Valley
were also parties to the addendum, but Reliant was not.

3.       Problems
in Communications with, and Payment by, Westfield

In May
2001, Eakin sent Gouge a letter complaining that Gouge had not been returning
Brown’s phone calls and had not executed signature confirmation of volumes and
dollar amounts and that such communication problems made Eakin uncomfortable
and was unacceptable, particularly given the large amounts of money involved.
The letter specifically complained about a late payment in February 2001.

Not
addressed in the letter was a separate problem that Cotton Valley had with
timely payments by Westfield.  On
occasion, Cotton Valley’s payments were held up because of pricing issues that
Westfield had with Reliant.  When that
occurred, Brown would call Gouge.  If she
could not reach him, she would call the accounting department, and if the delay
was more serious, she would call Bank One. 
Reliant would also take Brown’s calls if she had a question about
accounting. 

4.       The Gas Balance Transfers
Between Cotton Valley and Reliant, and Reliant’s Unannounced Transfer of Cotton
Valley’s Gas in August 1999

 

          Because
nominations entered by producers are actually only estimates of projected gas
flow, the nominations of gas entered by Cotton Valley for Reliant often turned
out to be lower or higher than the amount of gas that actually flowed into the
pipeline, and for which Reliant had entered nominations, leaving Reliant with
either more or less gas than purchased. 
These imbalances were handled between Cotton Valley and Reliant by way
of imbalance transfers between the two companies.[20]  Imbalance transfers were effectuated by
filling out a form from the pipeline system to transfer volumes from one party
to another so that the pipeline could track and allocate the proper volumes to
the proper parties.

Cotton
Valley tracked the imbalances between Reliant and itself and the two companies
made numerous agreements for imbalance transfers of gas between themselves as
needed.  Westfield played no role in
these transactions and none of the imbalances was ever credited to
Westfield.  Westfield had no relationship
with the pipeline, nor did it have an operating‑balance agreement with
the pipeline to track what was owed to or from a company, which was required to
conduct balance transfers.  Cotton Valley
did send an explanation once to Westfield when the transactions between Cotton
Valley and Reliant affected invoicing to Westfield.  

          In August 1999, without the knowledge
or agreement of Cotton Valley, Reliant did not make a nomination for Cotton
Valley’s gas for August 1, 1999, even though the gas had flowed from Cotton
Valley to Reliant that day.  By doing so,
Reliant effectively made up “on its own” for an imbalance of Cotton Valley’s
gas that Reliant was due, without the customary procedures, without notifying
the pipeline, and without any notice to Cotton Valley.  Reliant “just essentially took [Cotton
Valley’s] gas without telling [Cotton Valley] about it.”  Brown discovered this when she received the
allocation sheets from the pipeline in September.  She sent a fax to Gouge, explaining the
situation and protesting Reliant’s action. 
Brown stated that she was “fine” with Reliant making up the imbalance
but wanted to know “up front” what was going on and what Reliant wanted to do
or Cotton Valley “would stop doing business with them.”

D.      The July
2001 Gas Transfers and August 2001 Billing 

          In June
2001, Brown sent a nomination to Brubaker at Reliant for the expected July 2001
production, following the usual procedures. 
On July 25, 2001, Brown sent a fax to Brubaker, advising Brubaker that
she wanted to do a nomination change to increase the amount of gas to be
delivered because Cotton Valley had a new producer and so more gas was
available.  Brown actually dealt with
Gary Groft, another scheduler for Reliant, and suggested an additional volume
of gas to be sold at the “Gas Daily” price. 
Reliant agreed to accept the additional gas.  Brown did not ask Westfield if it wanted to
purchase the gas because Reliant was the company who was actually picking up
Cotton Valley’s gas.  Brown did not
inform Westfield about the additional gas, and no one at Reliant told Brown
that she needed to talk to Westfield; Reliant simply agreed to accept the
additional gas at the proposed price.  Reliant
received physical possession of the gas and later either Reliant traded it or
its affiliates burned it and sold it as electricity.

          In August 2001, Cotton Valley sent an
invoice to Westfield for the July gas, including the extra gas brought online
in the last five days of the month, for a total amount due of
$1,080,584.25.  The extra gas was about
$68,000 of the total due.  Gouge sent
back the invoice with a confirming signature authorizing payment.  The 25th of the month fell on a weekend and
so Cotton Valley was not expecting to get paid until the following Monday.  When no money arrived on the following
Monday, Brown tried to reach Gouge, but he did not return her calls.  She did reach Campbell, who told her that he
thought there was a pricing issue between Gouge and Reliant. Since such
situations had arisen before, Brown did not become alarmed, although she was
still concerned about the payment because Cotton Valley had expenses that it
needed to pay and payments that it needed to make to the producers based on the
producers’ shares in the co-op. The producers themselves needed the payments to
pay production taxes and royalty fees.

          When Brown had not heard from
Westfield by August 29, she called Dunnavant at Reliant to ask about the money
that was due and the pricing issue mentioned to her by Campbell.  Cotton Valley had been given Dunnavant’s name
as a contact by Gouge, but Brown had never spoken to him before.  Dunnavant told her that he was not aware of
any pricing issues, he was not involved in trading anymore and did not talk to
Gouge about trading, but he would look into the matter and see what he could
find out.  Dunnavant also told Brown that
he was not aware of any reason that Reliant would not have sent Gouge his
money.  Brown told Dunnavant that “he
owes us a million and 80 thousand” and that the “guys” were getting “really
uneasy.”  The following day, August 30,
not having heard back from Dunnavant, she called him again, this time in the
presence of Eakin.  Dunnavant told her
that he thought that there was a pricing issue, but that the money had been
placed in the escrow account on August 27 and he did not know why Cotton Valley
had not been paid.  Late in the afternoon
that day, Cotton Valley received a fax from Westfield explaining that there had
been a pricing issue between Westfield and Reliant and that Cotton Valley would
not be paid for the July 2001 gas. 
Cotton Valley was never paid for the gas by either Westfield or Reliant.

E.      Testimony at Trial from
Gouge and Reliant Regarding Westfield’s Status as an Agent for Reliant Relative
to the Cotton Valley Deal

 

Cotton
Valley subsequently filed the underlying suit in this appeal against Gouge,
Westfield, and Reliant, seeking payment for the July 2001 gas under various
legal theories.  By the time the case
went to trial, only Reliant remained as a defendant, and the only legal
theories submitted to the jury were that Reliant was responsible to pay for the
July 2001 gas because of either actual or apparent agency on the part of
Westfield and that Cotton Valley was estopped from seeking a payment from
Reliant for the July 2001 gas.

At trial,
the following testimony was given by Westfield and Reliant regarding
Westfield’s role in the Cotton Valley deal and whether Westfield had actual
authority to act as Reliant’s agent for the purchase of natural gas from Cotton
Valley.

          1.       The Testimony of Gouge

          Gouge
testified that “had [Westfield] contracted Cotton Valley’s gas directly with
[Reliant], [he] undoubtedly would have negotiated terms and price on behalf of
[Reliant] to do that; but [Westfield] didn’t. 
[Cotton Valley] did contract with [Westfield]; and [Westfield] in turn,
contracted with [Reliant]. [21]  So, the terms and conditions that [Gouge]
negotiated with Cotton Valley were done to the benefit of Westfield.”  Gouge agreed that he did not have to check
with Reliant before aggregating the gas because Reliant had agreed to take all
he could aggregate and agreed that “as a result, [he] had the authority from [Reliant]
to go out and get this gas; [he would] negotiate a price and terms for gas that
was to be delivered to [Reliant]; [t]hat was the deal[.]”  Gouge testified that Cotton Valley sold its
gas to Westfield and Westfield then sold the gas to Reliant and reiterated that
he had been buying Cotton Valley’s gas on behalf of Westfield.  Gouge also acknowledged that Westfield owed
Cotton Valley the disputed amount for the July 2001 gas, but stated that he
felt “that Reliant is also responsible.” 

          2.       The
Testimony of Dunnavant

           Dunnavant understood the relationship between
Westfield and Reliant, as far as the Cotton Valley gas was concerned, to be one
in which Westfield was selling gas to Reliant. 
Dunnavant said that he was not aware that Gouge had used Reliant’s name
when Gouge approached Cotton Valley, that he had not discussed Cotton Valley
with Gouge before Gouge approached it, and that he first heard of Cotton Valley
after Gouge had secured an agreement with Cotton Valley for gas.  According to Dunnavant, Westfield had not
been authorized by Reliant to buy Cotton Valley’s gas for Reliant’s
account.  Dunnavant also stated that the
fact that Reliant was receiving the nominations from Cotton Valley did not mean
that it was buying the gas from Cotton Valley; Reliant’s scheduler was involved
in the process because the nominations received from Westfield only had
volumes, but Reliant needed additional information, such as meter numbers, for
the physical‑nomination process so that the gas could actually flow to
Reliant.

          3.       The Jury’s Verdict

          At trial,
the jury was asked to answer the following questions, and it gave the following
answers:

QUESTION NO. 1

          Did Reliant and Cotton Valley agree that Reliant would pay
Cotton Valley for its 2001 gas production? 

 

Definitions
and Instructions

A party’s conduct includes
the conduct of another who acts with the party’s authority or apparent
authority.

 

“Authority” for Westfield to
act for Reliant must arise from Reliant’s agreement that Westfield act on
behalf and for the benefit of Reliant in purchasing gas from Cotton Valley.

 

“Apparent
authority” exists if Reliant:

          (1) knowingly permitted Westfield to hold itself out to
Cotton Valley as having authority to act on Reliant’s behalf in purchasing gas
from Cotton Valley, or

 

(2) through lack of ordinary
care, bestowed on Westfield such indications of authority that would lead a
reasonably prudent person to rely on the apparent existence of authority to his
detriment.

 

Only the acts or omissions
of Reliant may be considered in determining whether apparent authority exists.  Apparent authority may only be based on facts
known to, and relied upon by, Cotton Valley.

 

(1)  Answer “Yes” or “No” as to authority: Yes

 

(2) Answer “Yes” or “No” as
to apparent authority: Yes

 

If you answered “Yes” to any
part of Question No. 1, then answer the following question.  Otherwise do not answer the following
question. 

 

QUESTION NO. 2

          Is Cotton Valley estopped from seeking payment from Reliant
for its July 2001 gas production? 

 

Definitions
and Instructions

“Estoppel” precludes a party
from asserting, to another’s disadvantage, a right inconsistent with a position
previously taken. 

 

Answer “Yes” or “No”            No

 

The jury
was not asked to determine the amount of damages.  Before the jury verdict, the parties
stipulated that Cotton Valley had not been paid for the July 2001 gas
production and that the amount in controversy was $1,067,322.19.  The parties also subsequently stipulated as
to attorney’s fees.

4.       The
Judgment Notwithstanding the Verdict, the Rendition of Judgment, and the Motion
for New Trial

 

After the
jury verdict, Reliant filed a motion for judgment notwithstanding the verdict,
challenging all three of the jury’s findings. 
After reviewing briefing from both parties, and conducting a hearing on
the motion, the trial court granted the motion as to the actual‑authority
finding and denied it as to the jury’s findings on apparent authority and
estoppel.

The trial
court subsequently rendered a judgment in Cotton Valley’s favor for
$1,067,322.20 in damages, along with pre- and postjudgment interest and
attorney’s fees.

Reliant
filed a motion for new trial asserting that (1) there was factually‑insufficient
evidence to support the jury’s finding on actual authority, (2) there was
factually‑insufficient evidence to support the jury’s finding on
estoppel, (3) the admission of certain evidence was erroneous and likely caused
the rendition of an improper verdict, and (4) a new trial should be granted in
the interest of justice.  The trial court
denied Reliant’s motion for new trial.

Sufficiency Contentions on Appeal

          Three
sufficiency issues are presented in this appeal.  In its first issue, Reliant challenges the
legal and factual sufficiency of the jury’s finding of apparent authority.  In its second issue, Reliant argues that it
proved its affirmative defense of quasi-estoppel “as a matter of law,” raising
a legal‑sufficiency challenge to the jury’s adverse finding; elsewhere in
its brief, Reliant also raises a factual‑sufficiency challenge to this
adverse finding.  Finally, in its sole
issue, Cotton Valley challenges the trial court’s judgment notwithstanding the
verdict on the issue of actual authority, an issue which we review under legal‑sufficiency
standards.  See Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709 (Tex.
2003).

A.      Sufficiency Standards of
Review

          1.       Legal‑sufficiency standard

In reviewing the legal sufficiency of the evidence, we
must consider the evidence in the light most favorable to the fact-finder’s
decision and indulge every reasonable inference that would support it.  City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005). “The final test for legal
sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review. . . .
[L]egal-sufficiency review in the proper light must credit favorable evidence
if reasonable jurors could, and disregard contrary evidence unless reasonable
jurors could not.”  Id. at 827.  The jury is the sole judge of witnesses’
credibility, and it may choose to believe one witness over another; a reviewing
court may not impose its own opinion to the contrary.  Id. at 819.  Because it is the jury’s province to resolve
conflicting evidence, we must assume that jurors resolved all conflicts in
accordance with their verdict if reasonable human beings could do so.  Id.

          When
a party attacks the legal sufficiency of an adverse finding on an issue for
which it did not have the burden of proof, it must demonstrate that there is no
evidence to support the adverse finding. 
Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983).  Such a no-evidence challenge will be sustained
when “‘(a) there is a complete absence of evidence of a vital fact, (b) the
court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact, (c) the evidence offered to prove a
vital fact is no more than a mere scintilla, or (d) the evidence conclusively
establishes the opposite of the vital fact.’” 
King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003)
(quoting Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997)).  More than a scintilla of
evidence exists when the evidence “rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions.”  Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 601 (Tex. 2004) (quoting Havner,
953 S.W.2d at 711).  However, evidence
does not exceed a scintilla if it is so weak as to do no more than to create a
mere surmise or suspicion that the fact exists. 
Ford Motor Co., 135 S.W.3d at 601 (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex.
1983)). 

          When a party attacks the legal
sufficiency of an adverse finding on an issue on which it has the burden of
proof, it must demonstrate on appeal that the evidence establishes, as a matter
of law, all vital facts in support of the issue.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).  In reviewing such a matter-of-law challenge, the reviewing court employs
a two-part test.  Pac. Employers Ins.
Co. v. Dayton, 958 S.W.2d 452, 455 (Tex. App.—Fort Worth 1997, pet. denied)
(citing Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 940
(Tex. 1991)).  The reviewing court first examines the record for
evidence that supports the finding, while ignoring all evidence to the
contrary.  Dow Chem. Co., 46
S.W.3d at 241.  If there is no
evidence to support the finding, the reviewing court will then examine the
entire record to determine if the contrary proposition is established as a
matter of law.  Id.  The issue should be
sustained only if the contrary proposition is conclusively established.  Id.

2.       Factual‑sufficiency
standard

          In a
factual-sufficiency review, we
must examine both the evidence supporting and contrary to the judgment.  See Dow Chem. Co., 46 S.W.3d at
242; Plas-Tex, Inc. v.
U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).  The jury is the sole judge of witnesses’
credibility, and it may choose to believe one witness over another; a reviewing
court may not impose its own opinion to the contrary.  See Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 761 (Tex. 2003).

          In reviewing a factual-sufficiency challenge to a jury
finding on an issue on which the party did not have the burden of proof, we
consider and weigh all of the evidence and set aside the verdict only if the
evidence that supports the jury finding is so weak as to make the verdict
clearly wrong and manifestly unjust.  Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Bay, Inc. v. Ramos, 139
S.W.3d 322, 329 (Tex. App.—San Antonio 2004, pet. denied).

When a
party attacks the factual sufficiency of an adverse finding on an issue on
which it has the burden of proof, it must demonstrate on appeal that the
adverse finding is against the great weight and preponderance of the
evidence.  Dow Chem. Co., 46 S.W.3d at 242.  The court of appeals must consider and weigh
all of the evidence, and the court can set aside a verdict only if the evidence
is so weak or if the finding is so against the great weight and preponderance
of the evidence that it is clearly wrong and unjust.  Id.

3.       Review of judgment
notwithstanding the verdict

 

          A trial court may render a judgment
notwithstanding the verdict on a jury finding if (1) there is no evidence to
support the finding or (2) a legal principle precludes recovery.  Tex.
R. Civ. P. 301 (providing that court “may render judgment non obstante
verdicto if a directed verdict would have been proper, and . . . may
. . . disregard any jury finding on a question that has no support in
the evidence”); Tiller v. McLure, 121
S.W.3d 709, 713 (Tex. 2003); Williams
v. Briscoe, 137 S.W.3d 120, 124 (Tex.
App.—Houston [1st Dist.] 2004, no pet.); John
Masek Corp. v. Davis, 848 S.W.2d 170, 173 (Tex. App.—Houston [1st Dist.]
1992, writ denied).

          In reviewing a judgment
notwithstanding the verdict, we apply a legal‑sufficiency‑review
standard, viewing the evidence in the light most favorable to the jury’s
verdict and disregarding all evidence and inferences to the contrary.  Miller,
102 S.W.3d at 709; see also City of
Keller, 168 S.W.3d at 823 (explaining when there is “no-evidence” of
fact).  If more than a scintilla of
competent evidence supports the jury’s findings, “the jury’s verdict and not
the trial court’s judgment must be upheld.” Miller,
102 S.W.3d at 709; Williams, 137
S.W.3d at 124. 

4.       Sufficiency
of Jury Finding Measured by Charge Actually Given to Jury Absent Objection 

 

          When neither party objects to a jury
instruction, an appellate court must review the sufficiency of the evidence in
light of the instruction actually given, even if the statement of the law given
in the charge is not correct, and even if the charge as given effectively
increases the burden of proof on a party beyond that actually required by the
correct law or results in a “more rigorous standard” of proof.  See
Romero v. KPH Consol., Inc., 166 S.W.3d 212, 220–21 (Tex. 2005); Wal-Mart Stores, Inc. v. Sturges, 52
S.W.3d 711, 715 (Tex. 2001); City of Fort
Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000); IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C., 116 S.W.3d 888,
897, n.8 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). 

B.      Actual and Apparent
Authority

1.       Legal
principles Governing Actual and Apparent Authority

a.       General Agency Principles

“An agent
is one authorized by another to transact some business for the principal; the
relationship is a consensual one between two parties, by which one party acts
on behalf of the other, subject to the other’s control.” Jamison v. Nat’l Loan Investors, L.P., 4 S.W.3d 465, 468 (Tex.
App.—Houston [1st Dist.] 1999, pet. denied). 
Authorization to act and control of the action are the two essential
elements of agency.  Gonzales v. Am. Title Co., 104 S.W.3d 588, 593 (Tex. App.—Houston
[1st Dist.] 2003, pet. denied).

The law
does not presume agency, and the party asserting agency has the burden to prove
it.  IRA
Res., Inc. v. Griego, 221 S.W.3d 592, 597 (Tex. 2007).  A “good faith belief” on
the part of a third‑party that a person with whom it is dealing is the
agent of another is not enough to bind the purported principal.  2616 S.
Loop LLC v. Health Source Home Care, Inc., 201 S.W.3d 349, 356 (Tex.
App.—Houston [14th Dist.] 2006, no pet.); Coker
v. Cramer Fin. Grp., Inc., 992 S.W.2d
586, 595 (Tex. App.—Texarkana 1999, no pet.). 
A principal is liable for the acts of another acting as its agent only
when the agent has actual or apparent authority to do those acts or when the
principal ratifies those acts.  Spring Garden 79U, Inc. v. Stewart Title Co.,
874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no pet.).  An agent’s authority to act on behalf of a
principal depends on words or conduct by the principal either to the agent
(actual authority) or to a third-party (apparent authority).  Id.
at 950; see also Walker Ins. Servs. v.
Bottle Rock Power Corp., 108 S.W.3d 538, 550 (Tex. App.—Houston [14th
Dist.] 2003, no pet.); Suarez v. Jordan,
35 S.W.3d 268, 272–73 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

          b.      Actual Authority

Actual
authority includes both express and implied authority.  2616 S.
Loop LLC, 201 S.W.3d at 356; Spring
Garden 79U, 874 S.W.2d at 948. 
Express authority is delegated to an agent by words of the principal
that expressly and directly authorize the agent to do an act or series of acts
on behalf of the principal.  Crooks v. MI Real Estate Partners, LTD,
238 S.W.3d 474, 483 (Tex. App.—Dallas 2007, pet. denied).  Implied authority is the authority of an
agent to do whatever is necessary and proper to carry out the agent’s express
powers.  Id.  Implied agency therefore
exists only as an adjunct to express actual authority; an agent that does not
have express authority cannot have implied authority.  Id.; Spring Garden 79U, 874 S.W.2d at 948.

 Actual authority denotes the authority which a
principal (1) intentionally confers upon an agent, (2) intentionally allows the
agent to believe he possesses, or (3) by want of ordinary care allows the agent
to believe himself to possess. Behring
Intern, Inc. v. Greater Houston Bank, 662 S.W.2d 642, 649 (Tex.
App.—Houston [1st Dist.] 1983, writ dism’d); see also Crooks, 238 S.W.3d at 483. 
In order to prove actual authority, therefore, there must be evidence
that either (1) the principal intentionally conferred authority on another to
act as its agent, or (2) the principal intentionally, or by a want of due care,
allowed another to believe that it possessed authority to act as the
principal’s agent.  See 2616 S. Loop LLC, 201 S.W.3d at 356; Spring Garden 79U, 874 S.W.2d at 949–50.

Accordingly,
in determining whether a party had actual authority to act for another, we
examine the words and conduct by the principal to the alleged agent regarding
the alleged agent’s authority to act for the principal.  See
Walker Ins. Servs, 108 S.W.3d at
550; Suarez, 35 S.W.3d at 273; Spring Garden 79U, 874 S.W.2d at 950. 

          c.
      Apparent Authority

Apparent
authority is the power of an agent to affect the legal relations of the
principal by transactions with a third person. 
Ames v. Great S. Bank, 672
S.W.2d 447, 450 (Tex. 1984).  An agent
acting within the scope of his apparent authority binds the principal as if the
principal itself had taken the action.  Id. Apparent authority is based on
estoppel, and only the conduct of the principal in leading a third party to
believe that the agent has authority may be considered.  Gaines
v. Kelly, 235 S.W.3d 179, 182 (Tex. 2007); NationsBank, N.A. v. Dilling, 922 S.W.2d 950, 953 (Tex. 1996).  Declarations of authority by the alleged
agent, without more, do not establish either the existence or the scope of the
alleged authority.  Gaines, 235 S.W.3d at 183–84. 
Rather, the reviewing court looks to “acts of participation, knowledge,
or acquiescence by the principal.”  Ins. Co. of N. Am. v. Morris, 981 S.W.2d
667, 672 (Tex. 1998).  Without the
principal’s participation, either through its “acts or knowledge of, and
acquiescence in those of the agent,” no mere combination of circumstances,
including acts of the purported agent which may mislead persons into a false
inference of authority, however reasonable, will serve as the predicate for
apparent authority. Hall v. F.A.
Halamicek Enters., Inc., 669 S.W.2d 368, 375 (Tex. App.—Corpus Christi
1984, no pet.); see also Sikes v Heritage
Oaks W. Ret. Vill., 238 S.W.3d 807, 810 (Tex. App.—Waco 2007, pet. denied);
Suarez, 35 S.W.3d at 268; Disney Enterps. Inc. v. Esprit Fin., Inc.,
981 S.W.2d 25, 30 (Tex. App.—San Antonio 1998, pet. dism’d w.o.j.).

Apparent
authority arises either from (1) a principal knowingly permitting an agent to
hold himself out as having authority, or (2) a principal’s actions which lack
such ordinary care as to clothe an agent with the indicia of authority, thus
leading a reasonably prudent person to believe that the agent has the authority
he purports to exercise.  Gaines, 235 S.W.3d at 182. The standard
used is that of “a reasonably prudent person, using diligence and discretion to
ascertain the agent’s authority.”  Id. at 182–83 (citing Chastain v. Cooper & Reed, 257
S.W.2d 422, 427 (Tex. 1953)).  In order
for apparent authority to be established, it is also essential that the
principal have full knowledge of all material facts at the time of the conduct
alleged to be the basis for the estoppel. 
Gaines, 235 S.W.3d at 182; Rourke v. Garza, 530 S.W.2d 794, 803
(Tex. 1975).  Because apparent authority
is an estoppel principle, a party seeking to recover under such legal theory
must show justifiable reliance on the principal’s words or conduct resulting in
harm to the party.  See Tex. S. Rentals, Inc. v. Gomez, 267 S.W.3d 228, 246 (Tex.
App.—Corpus Christi 2008, no pet.) (citing Baptist
Mem’l Hosp. Sys. v. Sampson, 969 S.W.2d 945, 948 & n.2 (Tex. 1988)
(holding that apparent agency in Texas is based on “the notion of estoppel,
that is, a representation by the principal causing justifiable reliance and
resulting harm.”)).

Accordingly,
in order to determine an agent’s apparent authority, we examine the conduct of
the principal and the reasonableness of the third party’s assumptions regarding
authority.  See Gaines, 253 S.W.3d at 183.

2.       The Judgment
Notwithstanding the Verdict on Actual Authority

We consider
first Cotton Valley’s sole issue.  Cotton
Valley asserts that the trial court erred in rendering a judgment
notwithstanding the verdict on the issue of actual authority and argues that
“there was factually and legally sufficient evidence to support the actual
authority finding.”  As we have noted, a
challenge to a trial court’s rendition of a judgment notwithstanding the verdict
is reviewed under a legal‑sufficiency standard.  Miller,
102 S.W.3d at 709.  We therefore consider
whether, viewing the evidence in the light most favorable to the jury verdict,
there is more than a scintilla of evidence supporting the jury’s verdict on
actual authority.  Id.

Under the
charge actually given to the jury in this case, in order for the jury to
determine that actual “authority” existed for Westfield to act for Reliant, it
was required to find that Reliant had an “agreement” with Westfield that
“Westfield act on behalf and for the benefit of Reliant in purchasing gas from
Cotton Valley.”[22]  The charge as submitted to the jury only
permitted the jury to find actual authority by way of an intentional conference
of authority in an agreement between the parties; the charge did not provide
the jury with the option to find actual authority on any other allowable legal
basis, such as by Reliant intentionally, or by want of due care, allowing
Westfield to believe that it had authority. 
See Berhing Int’l, Inc., 662
S.W.2d at 649.  Because neither party
objected to the wording of this instruction as given to the jury,[23]
we measure the sufficiency of the evidence to prove actual agency in light of
the actual instruction given to the jury, rather than by the instruction that
should have been given.  See Scottsdale Ins. Co. v. Nat’l Emergency
Servs., Inc., 175 S.W.3d 284, 300–01 (Tex. App.—Houston [1st Dist.] 2004,
pet. denied); see also Ancira Enters.,
Inc. v. Fischer, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.)
(reviewing sufficiency by definition of “malice” actually submitted to jury
rather than stricter definition of malice that was legally applicable). 

Reviewing
the record in the light most favorable to the jury’s finding, we conclude that
the trial court did not err in rendering the judgment notwithstanding the
verdict on the issue of actual authority. 
The answers of Gouge and Dunnavant in cross-examination relied upon by
Cotton Valley to support its issue do not present any evidence that an actual
agreement between Reliant and Westfield existed that “Westfield act on behalf
and for the benefit of Reliant in purchasing gas from Cotton Valley.”[24]  While there was evidence of a written base‑purchase
agreement between Reliant and Westfield establishing a purchaser-seller
relationship, and evidence of an oral agreement between them that Reliant would
purchase as much gas as Gouge could aggregate from producers for delivery to
Reliant, there was no evidence of any agreement that Westfield “act on behalf
and for the benefit of Reliant in purchasing gas from Cotton Valley.”  The testimony cited by Cotton Valley would,
at most, “create a mere surmise or suspicion” regarding the existence of such
an agreement, see Ford Motor Co., 135
S.W.3d at 601, and even such a “surmise or suspicion” would have been dispelled
by (1) the direct evidence of the written agreement between the parties
establishing a seller‑purchaser, not a principal‑agent,
relationship, (2) the testimony by Brown and Gouge that the “price and terms of
gas” negotiated by Gouge with Cotton Valley were not the “price and terms”
applicable to Reliant, but were applicable only to Westfield, and (3) the
specific testimony from Dunnavant denying that Reliant had given Westfield
authority to buy Cotton Valley’s gas on Reliant’s behalf and from Gouge that he
had been acting on Westfield’s behalf, not Reliant’s, when he purchased Cotton
Valley’s gas.[25]

We overrule
Cotton Valley’s sole issue.

3.       The Jury’s
Verdict of Apparent Authority

a.       Reliant’s Contentions and
Our Standard of Review

 

In its
first issue, Reliant asserts that there is no evidence to support the jury’s
finding that Westfield had apparent authority to act for Cotton Valley or,
alternatively, that the jury’s finding was against the great weight and
preponderance of the evidence. 

Reliant
complains that (1) there was no evidence that Cotton Valley exercised
“reasonable diligence to ascertain the fact or scope of Westfield’s apparent
authority,” (2) there was no conduct on the part of Reliant that bestowed
indications of authority on Westfield, and (3) there was no evidence of
“reasonable reliance” by Cotton Valley on any conduct by Reliant.  Reliant contends that, in reviewing the
sufficiency of the evidence to support this finding, we may not consider the
acts of Gouge, any facts not known to Cotton Valley, or any conduct by Cotton
Valley that was consistent with the parties’ actual relationship.  Reliant then argues that any “omissions” by it
cannot support an apparent authority finding, that there was no evidence that
Cotton Valley exercised diligence to ascertain the fact or scope of Westfield’s
apparent authority, there was no evidence of any acts on its part which
bestowed indications of authority on Westfield, and that there was no evidence
of “reasonable reliance” by Cotton Valley on any conduct by Reliant.

          In conducting our legal‑sufficiency
review, we consider the evidence in the light most favorable to the
fact-finder’s decision and indulge every reasonable inference that would
support it.  City of Keller, 168 S.W.3d at 822. 
Reliant must establish that there is “no evidence” to support the
challenged finding.  Chapman, 118 S.W.3d at 751.  In reviewing Reliant’s factual‑sufficiency
challenges, we must consider
and weigh all of the evidence and may set aside the verdict only if the
evidence that supports the challenged jury finding is so weak as to make the
verdict clearly wrong and manifestly unjust. 
Cain, 709 S.W.2d at 176; Bay, Inc., 139 S.W.3d at 329.

Because
there was no objection to the language of the jury charge regarding apparent
authority,[26]
we measure the sufficiency of the evidence to support the jury’s finding of
apparent authority in light of the jury charge actually given.[27]  See
Romero, 166 S.W.3d at 220–21.  Under
the charge submitted, the jury was authorized to find that apparent authority
existed if Reliant 

(1) knowingly permitted
Westfield to hold itself out to Cotton Valley as having authority to act on
Reliant’s behalf in purchasing gas from Cotton Valley, or

 

(2) through lack of ordinary
care, bestowed on Westfield such indications of authority that would lead a
reasonably prudent person to rely on the apparent existence of authority to his
detriment.

 

The jury
was also instructed that (1) “only the acts or
omissions[28]
of Reliant” could be considered in determining whether apparent authority
existed and (2) apparent authority could only be based on facts known to, and
relied upon by, Cotton Valley.  (Emphasis
added.)

          b.      “Reasonable Diligence to Ascertain Fact or Scope
of 

                   Westfield’s Apparent
Authority”

 

We first
note that, under the jury charge submitted, the jury was not required to
consider whether Cotton Valley exercised “reasonable diligence to ascertain the
fact or scope of Westfield’s apparent authority” in making its apparent
authority finding.  “[R]easonable
diligence to ascertain [an] agent’s authority” is part of the standard under
Texas law for determining whether a person is “reasonably prudent” in the
context of apparent authority, see Gaines, 235 S.W.3d.at 182–83, and, therefore, an instruction requiring a jury to
evaluate “a reasonably prudent person” under that standard would be appropriate.  See Tex. R. Civ. P. 273, 277.  However, in the instant case, no such
instruction was requested by any party, nor was its omission objected to by
either party.  Nor was the jury
instructed that Cotton Valley was not entitled to recover on a theory of
apparent authority in the absence of the use of “reasonable diligence to ascertain
[Westfield’s] authority.”

Instead,
the jury was instructed that it could find apparent authority if it found, by a
preponderance of the evidence, that through lack of ordinary care, Reliant
bestowed on Westfield such indications of authority that would lead a “reasonably prudent person” to rely on
the apparent existence of authority to his detriment.  On appeal, we must measure the sufficiency of
the evidence by the language actually given to the jury in the charge, rather
than by the correct legal standard under Texas law of “a reasonably prudent
person, acting with diligence and discretion to ascertain the agent’s
authority” as set out in Gaines.  See
Romero, 166 S.W.3d at 220–21; Sturges, 52 S.W.3d at 715; Zimlich, 29 S.W.3d at 71; see also Kroger Co. v. Brown, 267 S.W.3d 320, 323 (Tex. App.—Houston [14th Dist.]
2008, no pet.) (measuring sufficiency by commonly-understood meaning
of disfigurement, when definition of disfigurement recognized in Texas law was
not submitted in jury charge); EMC Mortg.
Corp. v. Jones, 252 S.W.3d 857, 868–69 (Tex. App.—Dallas 2008, no pet.)
(reviewing sufficiency based on common meaning of “unreasonable,” rather than
correct legal standard, when no definition or instruction placing
“unreasonable” in proper legal context was given to jury and no objection made
to language of charge); Ancira Enters.,
Inc., 178 S.W.3d at 93 (reviewing sufficiency under less‑stringent
definition of malice than actually applicable by law to retaliation suits
because jury charge provided less‑stringent definition rather than
correct stricter definition).  The jury
was authorized, under the charge given, to find apparent authority without
evidence of Cotton Valley’s “using diligence and discretion to ascertain
[Westfield’s] authority.” 

We overrule
this portion of Reliant’s legal‑sufficiency challenge.

c.       Conduct of Reliant and Cotton Valley’s Reliance

In our
review of the remaining sufficiency complaints regarding apparent authority,
consistent with the instructions given to the jury, we consider (1) only the
“acts and omissions of Reliant,” [29]
not those of Gouge or Westfield, and (2) only the facts known to, and relied
upon by Cotton Valley.[30]

(i)      Reliant’s
Conduct Bestowing Indications of Authority on Westfield

 

Reliant
argues that Cotton Valley relies principally on representations by Westfield to
Cotton Valley and facts that were not known to Cotton Valley, which it properly
points out may not be relied upon in establishing apparent authority.    Reliant
also asserts that Reliant made no representations about Westfield before Cotton
Valley began selling its gas in April 1999 in the arrangement at issue, and
that any actions taken later by Reliant—such as receiving the gas directly and
communicating with Cotton Valley through schedulers—were consistent with its
actual relationship with Westfield and so could not have been relied upon by
Cotton Valley as bestowing indications of authority on Westfield.

Reliant is
correct that the record indicates that Reliant took no actions prior to the
April 1999 contract between Cotton Valley and Westfield upon which Cotton
Valley could have relied in making such contract.  However, the record reveals that the
contract, although supposed to be self-renewing according to Gouge, was not,
and so Cotton Valley’s decisions to sell its gas were made on a monthly basis
and Cotton Valley’s initial decision to sell the July 2001 gas in question was
made on or about June 28, 2001, when the first nomination was sent.  We therefore consider whether Reliant engaged
in any “acts or omissions” prior to June 28, 2001 which bestowed indications of
authority on Westfield.

Cotton
Valley contends that (1) Reliant’s taking physical delivery of the gas directly
from Cotton Valley, (2) its arrangements with Westfield regarding the use of
its schedulers, accounting department, and transportation agreements on the
Williams pipeline, (3) its allowing its name to be disclosed to Cotton Valley
in contravention of the usual business practices and its regular communications
with Cotton Valley, and (4) its direct communications with Cotton Valley on
end-month reconciliations, gas‑balance transfers, and ultimately, its
direct acceptance of the second July gas‑production packet, all served to
bestow indications of authority on Westfield.

Reviewing
the legal sufficiency of the evidence to support the jury’s finding of apparent
authority under either paragraph of the charge given, we conclude that there is
some evidence to support the jury’s finding that there were “acts or omissions”
by Reliant prior to June 28, 2001 which bestowed on Westfield indications of
authority.  While we would agree that
there was no evidence to support a finding under the first paragraph (that
Reliant knowingly permitted Westfield to hold itself out as having authority to
contract on Reliant’s behalf),[31]
we hold that there is some evidence to support a jury finding under the second
paragraph (that Reliant, “through lack of ordinary care, bestowed on Westfield
such indications of authority that would lead a reasonably prudent
person to rely on the apparent
existence of authority to his detriment.”). 
Considering the usual practices of the gas-selling business as testified
to at trial,[32]
we conclude that there was some evidence of a “pattern of conduct”[33]
by Reliant in its dealings with Cotton Valley that amounted to a “lack of
ordinary care” that bestowed “indications of authority” on Westfield.  Although there were facts known to Cotton
Valley, such as the different prices paid by Westfield and Reliant for the gas,
suggesting that Westfield was not Reliant’s actual agent, the actual—and
unusual—course of dealing between Reliant and Cotton Valley regarding the gas
arrangement, sometimes involving Westfield (as in the escrow account),
sometimes not, particularly the direct exchange of gas between Cotton Valley
and Reliant in gas‑imbalance transfers, and especially the August 1999
transaction in which Reliant essentially “took” Cotton Valley’s gas, supported
Cotton Valley’s belief in a “direct deal” between Cotton Valley and Reliant and
bestowed indications of authority on Westfield as Reliant’s apparent agent in
the arrangement.  Such evidence at least
“rises to a level that would enable reasonable and fair-minded people to differ
in their conclusions,” Ridgway, 135
S.W.3d at 601.  We therefore hold that
the evidence is legally sufficient to support the jury’s finding of conduct by
Reliant that “bestowed on Westfield. . . indications of authority.”

(ii)     Reasonable Reliance by
Cotton Valley 

 

We next
consider whether there is some evidence to support a finding of reasonable reliance
on the part of Cotton Valley.  In doing
so, we look at Reliant’s conduct from March 31, 1999 through June 28,
2001.  Reliant argues that Cotton Valley
did not rely on Reliant’s actions as bestowing authority on Westfield to act
for Reliant, or that its reliance was not reasonable, because Cotton Valley (1)
signed documents that listed Reliant as a resale customer and indicated that
Cotton Valley was selling gas to Westfield and Westfield was selling gas to
Reliant, (2) took actions to ensure that it received payment by Westfield
through a proposed escrow agreement, and (3) knew that the price that it
received from Westfield and the price that Reliant paid for the gas differed.  We review the sufficiency of the evidence as
to reliance in light of the jury charge actually given. See Romero, 166 S.W.3d at 220–21; Zimlich, 29 S.W.3d at 71. 
The jury charge mentions reliance twice: (1) in the second paragraph,
which permits the jury to find that actual authority exists if Reliant,
“through lack of ordinary care, bestowed on Westfield such indications of
authority that would lead a reasonably
prudent person to rely on the apparent existence of authority to his
detriment” and (2) in an instruction which stated that “[a]pparent authority
may only be based on facts known to, and
relied upon by, Cotton Valley.”
(Emphasis added.)

Reliant
argues that its cited evidence conclusively proves that Cotton Valley did not
rely on its dealings with Reliant, or at least not reasonably so.[34]  We disagree. 
As discussed previously, there is evidence in the record of an unusual
course of dealings between Reliant and Cotton Valley that supports a belief in
a “direct deal” between Reliant and Cotton Valley.  There is also evidence that Cotton Valley
relied on Reliant’s conduct during this unusual course of dealings in making
its decision to sell the July 2001 gas for delivery to Reliant.  We hold that the evidence in the record
supporting the jury findings on reliance “rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions” as to whether the indications bestowed
by Reliant were such as would lead a “reasonably
prudent person to rely on the
apparent authority to his detriment” and whether Reliant’s acts were actually “relied upon by [] Cotton Valley.”  We therefore hold that the evidence is
legally sufficient to support the jury’s findings regarding reliance.

d.      Review of
Factual‑Sufficiency Complaint

Reliant’s
entire factual‑sufficiency challenge to the jury’s finding on apparent
authority, after setting out the standard of review for legal sufficiency,
reads:

Here, considering and
weighing all the evidence in support of and contrary to the apparent authority
finding demonstrates any evidence is factually insufficient.  Even accepting arguendo the correctness of Cotton Valley’s assertion that some
evidence supports an apparent authority finding, that evidence is so weak as to
render the jury’s finding manifestly erroneous when properly weighed against
all the documentary and testimonial evidence that Cotton Valley could not have
relied on that evidence because it was on notice that the terms of the parties’
relationships were inconsistent with an agency relationship.  At a minimum, a new trial is required.

 

For the
reasons set out in our discussion of the legal sufficiency of the evidence, we
disagree.  After considering and weighing all of the evidence, we
hold that the evidence supporting the jury’s finding and apparent authority is
not so weak as to make the verdict clearly wrong and manifestly unjust.  See Cain, 709 S.W.2d at 176; Ramos,
139 S.W.3d at 329.

We overrule
Reliant’s first issue.

C.      Affirmative
Defense of Quasi-Estoppel

          In its second issue, Reliant complains
that it proved its affirmative defense of quasi-estoppel as a matter of law and
so it effectively challenges the legal sufficiency of the adverse jury finding
on quasi-estoppel in answer to jury question No. 2.[35]  See Tex. R. App. P. 38.1(f), 38.9; Sterner v. Marathon Oil Co., 767 S.W.2d
686, 690 (Tex. 1989) (holding that attack on adverse jury finding on which
appellant had burden of proof should be reviewed as assertion that appellant
had established its affirmative defense “as a matter of law.”).  Reliant argues that because Cotton Valley
always previously invoiced and looked to Westfield for the gas delivered to
Reliant, including the July 2001 gas, Cotton Valley is now estopped, as a
matter of law, from seeking payment from Reliant for the July 2001 gas. 

          “Quasi-estoppel precludes a party from
asserting, to another’s disadvantage, a right inconsistent with a position
previously taken.”  Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 864
(Tex. 2000). “The doctrine applies when it would be unconscionable to allow a
person to maintain a position inconsistent with one to which he acquiesced, or
from which he accepted a benefit.” Id.  “Thus, quasi-estoppel forbids a party from
accepting the benefits of a transaction and then subsequently taking an
inconsistent position to avoid corresponding obligations or effects.”  Eckland
Consultants, Inc. v. Ryder, Stilwell Inc., 176 S.W.3d 80, 87 (Tex.
App.—Houston [1st Dist.] 2004, no pet.).

          In order to meet its burden to show
that it proved its affirmative defense of quasi-estoppel, Reliant must
demonstrate on appeal there is evidence that establishes, as a matter of law,
all vital facts in support of the issue. 
Dow Chem. Co., 46 S.W.3d at
241.  In reviewing such a matter-of-law challenge, we first
examine the record for evidence that supports the finding, while ignoring all
evidence to the contrary; only if there is no evidence to support the
finding do we then examine the record to determine if the contrary proposition
is conclusively established as a matter of law.  See id. at 241–42. 

Reviewing
the entire record, we conclude that Reliant has not met its burden. There is
some evidence in the record, particularly in the testimony of Brown and Eakin,
and in the evidence regarding the nature of the payment arrangement, which from
the inception specifically involved Reliant paying funds into the escrow
account specifically for the gas purchased from Cotton Valley, that would
support a jury finding that Cotton Valley’s seeking of payment from Reliant
after July 2001 was not inconsistent with its invoicing of Westfield for the
gas delivered to Reliant.  There was
evidence in the record that, prior to July 2001, Cotton Valley’s position was that
Reliant was responsible for the payment of the gas purchased, even though
invoicing was made to, and payment made by, Westfield.  Reliant acknowledges some of such evidence,
but argues that it is “not credible” and so amounts to “no evidence.”

The jury is
the sole judge of the credibility of witnesses and a reviewing court may not
impose its own opinion to the contrary.  City of Keller, 168 S.W.3d at 819.  It is also the province of the jury to draw
whatever inferences it wishes from the evidence if more than one inference is
possible.  Id. at 821.  If the evidence
at trial would enable reasonable and fair-minded people to differ in their
conclusions, a legal‑sufficiency review is at an end.  Id. at
822.

In the
present case, we conclude that reasonable and fair-minded people could differ
in their conclusions as to whether Cotton Valley took the position, prior to
July 2001, that Reliant was ultimately liable for payment for the gas, even
though Cotton Valley previously sought payment from Westfield, not Reliant, for
the gas.  Accordingly, we hold that there
is some evidence to support the jury’s finding on the affirmative defense of
quasi-estoppel.

We overrule
Reliant’s second issue.

Evidentiary Complaints

In its
third issue, Reliant complains of the admission of certain evidence, offered by
Cotton Valley as relevant to the issue of actual authority, namely (1) evidence
that Westfield acted as Reliant’s actual agent for transactions with three
different companies, (2) evidence of Reliant’s “early-pays” of Westfield, and
(3) evidence of some correspondence that Westfield sent to another company and
of which Cotton Valley did not know. 
Reliant asserts that this evidence was not relevant as to either actual
or apparent authority and therefore mislead the jury.

We review a
trial court’s evidentiary rulings for an abuse of discretion.  See
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000).  A trial court abuses its discretion when it
acts without regard for any guiding rules or principles.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985).  Even if an evidentiary ruling is erroneous,
we will not reverse unless the erroneous ruling probably caused the rendition
of an improper judgment.  See Auld, 34 S.W.3d at 906.  Reversible
error in connection with rulings on questions of evidence usually does not
occur unless the complaining party can demonstrate that the whole case turned
on the evidence that was admitted.  City of Brownsville v. Alvarado, 897
S.W.2d 750, 753–54 (Tex. 1995).  We
determine whether the case turns on the admitted evidence by reviewing the
entire record.  See id.

We first
note that, although the trial court clearly indicated to the parties that it
was admitting the evidence solely as to the issue of actual authority, Reliant
did not request any limiting instruction to the jury, either at the time that
the evidence was offered or in the charge to the jury.  Accordingly, if the evidence was admissible
for any purpose, the trial court’s admission should be affirmed.  See Tex. R. Evid. 105(a); Auld,
34 S.W.3d at 906.  We consider first the
purpose for which the trial court actually admitted the evidence—to show actual
authority.

As to
actual authority, Reliant argues that the challenged evidence was not relevant
because “the only relevant evidence” in determining actual authority is (1)
evidence of communications between the principal and the agent conferring
authority and (2) evidence of the alleged agent’s understanding about its
authority.  We disagree.

Evidence is
relevant if it has “any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable
than it would be without the evidence.” Tex.
R. Evid. 401.  In determining
relevancy, we look at the purpose of offering the evidence and, if there is
some logical connection, either directly or by inference, between the fact
offered and the fact to be proved, the relevancy test is satisfied.  Serv.
Lloyds Ins. Co. v. Martin, 855 S.W.2d 816, 822 (Tex. App.—Dallas 1993, no
pet.).

Reviewing
the record as a whole, we conclude that the trial court did not abuse its
discretion in admitting the challenged evidence. The evidence of early pays and
Westfield’s relationship with Reliant as to other gas-producing companies was
admitted for the purpose of demonstrating that Reliant and Westfield had oral
agreements regarding their relationship and Westfield’s authority that were not
encompassed by the sole written contract between them and so would be logically
connected to the communications regarding authority between Reliant and
Westfield.[36]  Moreover, reviewing the record as a whole, it
is clear that the challenged evidence makes up only a small part of the
evidence and it cannot reasonably be said that the verdict would have probably
been different if it had been excluded.

We overrule
Reliant’s third issue.

New Trial for Cumulative Error

          In its fourth and final issue, Reliant
requests this Court to “grant a new trial” in the interest of justice due to “cumulative
error” by way of “the erroneous admission of inadmissible and prejudicial
evidence in combination with Cotton Valley’s improper argument.”

          We first note that, as a reviewing
court, we may not “grant a new trial in the interest of justice.”  See In
re Columbia Med. Ctr., L.P., 290 S.W.3d 204, 213 (Tex. 2009).  A trial court has the discretion to do so,
but we as a reviewing court have no such authority.  Id.
at 211 (“[A] trial court [has] considerable discretion to set aside a jury
verdict, even on its own motion . . . [a]ppellate judges have much less
discretion . . .”).  Compare Tex. R. Civ. P. 320
(providing trial court authority to grant “a new trial . . . for good
cause”) with Tex. R. App. P. 43.3 (providing court of appeal authority to remand for new trial in interest of
justice, if it concludes there is reversible error in trial court’s judgment).

          To the extent that Reliant is raising
a complaint regarding improper jury argument by Cotton Valley, we note that no
objection was made to this argument, nor did Reliant claim in its motion for
new trial that the argument was incurable, and so any complaint regarding the
argument is waived.  See Tex. R. App. P. 33.1(a)(1)(A); Arias v. Brookstone, L.P., 265 S.W.3d 459, 467 (Tex. App.—Houston
[1st Dist.] 2007, pet. denied).  To
the extent that Reliant is arguing that we should remand for a new trial
because of the admission of the complained‑of evidence in issue three, we
have already determined there was no error as to that admission so there is no
basis for a remand.

          We overrule Reliant’s fourth issue.

 

 

 

 

 Conclusion

We affirm
the judgment of the trial court.

 

 

 

 

 

                                                          Jim
Sharp

                                                          Justice

 

Panel
consists of Justices Keyes, Alcala, and Sharp.











[1]               Westfield
Oil & Gas, Inc. and Ernie Gouge, d/b/a Westfield Oil & Gas were
originally parties to the suit, as were several other plaintiffs; however, none
is a party to the judgment at issue and none is a party to this appeal.

 





[2]           The company is also known as Westfield Oil and Gas,
Inc.

 





[3]           Pipelines charge a fee for transporting gas on a
pipeline, similar to a motorist paying a toll for accessing a toll road, based
on the amount of capacity sought.  Only
companies affiliated with the pipeline are permitted to transport on the
pipeline.

 





[4]           The pipeline’s data system allowed access to producers
who purchased a “receipt point.”  The
system functioned as a communication center between buyers and sellers,
allowing parties to close deals by way of the nomination process.  A scheduler for a producer would submit a
nomination to the pipeline’s data system, entering the amount of volume of gas
that the seller was putting into the pipeline. 
Nominations had to be in the system on the last day of the month prior
to the month in which the gas was to be sold. 
The nomination was then matched up with the entity receiving the gas on
the other end.  A buyer could “pick up”
the gas purchased by making a nomination through its own scheduler into the
pipeline data system of the volume of gas to be retrieved from the system.  The act of inputting the nomination was the
only way the pipeline system could determine to whom the gas belonged.

 





[5]           Under its predecessor name of NorAm.

 





[6]               Reliant
would charge Westfield interest on these early pays because of the time value of
money.  Reliant also made early‑pay
accommodations to other companies.

 





[7]        Reliant
made such direct contracts with three companies—Crosstex, Cinergy, and
Tri-Union. 

 





[8]               It
is unclear when Reliant told Westfield to stop using its name, but the record
suggests that it was sometime after the Cotton Valley deal had been made.





[9]               Producers
transported their gas to market via pipelines. The pipeline in the area of
Cotton Valley was the Williams pipeline which had several different pipelines
to handle different amounts of pressure, and it was necessary to compress the
gas coming from the fields of various producers in order to get it into the
small‑pressure pipeline that traveled to where the marketers preferred to
buy, which was called the market zone. 

 





[10]             The
point at which gas entered the pipeline from a production field was called a
receipt point (also known as a wellhead). 
The pipeline would sell “taps,” which were meters to measure the gas
going out of a field and into the pipeline at receipt points.  The area where the gas entered the pipeline
at receipt points was called the production zone.

 





[11]             Westfield
had no transportation capacity on the Williams pipeline.





[12]             David
Dunnavant worked for Reliant during the period from 1999 through August
2001.  Among his responsibilities was
assembling a supply of natural gas for Reliant to trade and, along with Pat
Strange, Dunnavant dealt with Westfield regarding the Cotton Valley gas.

 





[13]             An mmBtu
is a measurement for natural gas, a unit of energy equal to a thousand cubic
feet of natural gas with a heating content of a thousand Btus (British thermal
units).





[14]             Inside FERC
is the name of a publication whose fixed monthly pricing of gas is the standard
for the industry.  “FERC” is an
abbreviation for the Federal Energy Regulatory Commission.

 





[15]             Gas Daily is
another industry publication. 

 





[16]             When
a producer makes a nomination, the nomination is only a projection of the
amount of gas that is expected to flow into the pipeline; the actual amount may
vary due to numerous conditions.  If the
actual amount of gas that flows into the system from the producer is less than
the nomination made, an imbalance is created. 
If the buyer of the gas enters a nomination to pick up more or less gas
than the seller actually places into the system, this also creates an
imbalance.





[17]             Reliant
was always invoiced by Westfield, never Cotton Valley.





[18]             Kane
later became manager of Cotton Valley after Eakin was discharged.

 





[19]             There
was no written gas purchase and sales agreement entered into between Cotton Valley
and Westfield on February 1, 2000.





[20]             Imbalances
between buyers and sellers could also be “cashed out,” meaning the seller could
pay the buyer the offset, but Cotton Valley preferred to do imbalance
transfers. 





[21]             Reliant
kept track of gas purchases through a computer system that gave each deal a
specific number and tracked physical trades and financial transactions.  In regard to Cotton Valley’s gas, Westfield
was shown as the other party to Reliant’s deal, not Cotton Valley, in contrast
to deals where Reliant had contracted directly with purchasers.





[22]             See
Definitions and Instructions for Jury Question No. 1.

 





[23]             Cotton
Valley made no objection to the charge. 
Reliant objected to the giving of any instruction on either actual or
apparent agency on the ground that there was no evidence of either actual or
apparent agency to support the giving of any instructions, including no
evidence that Cotton Valley knew or relied on any acts or omissions by
Reliant.  Reliant also objected that the
agency issue should be submitted “in broad form; so two separate lines.”  However, neither Reliant nor Cotton Valley
raised any objection to the wording of the “instructions and definitions” of
either actual or apparent agency given to the jury, nor does either claim on
appeal that the instructions actually given were defective.  “A party objecting to a charge must point out
distinctly the objectionable matter and the grounds of objection. Any complaint
. . . on account of any defect, omission, or fault in pleading, is waived
unless specifically included in the objections.”  Tex.
R. Civ. P. 274.  A general
objection to the submission of an instruction on the ground that it was “not
raised by the evidence” will not serve to alert the trial court to a specific
complaint regarding any defects in wording of the instruction actually
given.  See Davis v. Campbell, 572 S.W.2d 660, 663 (Tex. 1978).

 





[24]             Cotton
Valley relies on three answers by Gouge in cross-examination by Cotton Valley,
in which Gouge (1) acknowledged that he had an agreement with Reliant that it would
“take” whatever gas he could aggregate; and (2) answered “Yes” to the follow-up
question, as to whether he “had the authority from Reliant to go out and get
this gas; you negotiate a price and terms for gas that was to be delivered to
Reliant? That was the deal, correct?”; and (3) answered “Yes,” when asked if
Reliant knew that he was using their name in his attempts to find gas to
aggregate.  Cotton Valley also quotes an
answer by Dunnavant acknowledging the arrangement with Gouge that if Gouge
could bring Reliant packages of gas in certain areas, Reliant “w[as] interested
in that” and that Gouge “filled a slot” that its own people did not. 

 





[25]             We do
not address Cotton Valley’s arguments regarding evidence of Reliant’s “lack of
due care” because, as noted, the jury was not authorized by the charge to find
actual authority under that legal principle. 
We likewise do not address Cotton Valley’s arguments as to the factual
sufficiency of the evidence to support the jury’s finding of actual authority
because a review of a trial court’s rendition of a judgment notwithstanding the
verdict is conducted under legal‑sufficiency standards.  See
Miller, 102 S.W.3d at 709.

 





[26]             Neither
party raises any complaint about the charge on appeal.

 





[27]             The
language of the charge given is almost exactly the same language proposed by
Reliant in its First Amended Proposed Jury Charge and is based on Texas Pattern
Jury Charge 101.4.  Comm. On Pattern Jury Charges, State Bar of
Tex., Texas Pattern Jury Charges: Business · Consumer · Insurance · Employment
PJC 101.4 (2010).

 





[28]             The
phrase “or omissions” was not contained in Reliant’s First Amended Proposed
Jury Charge, nor is it a part of the Texas Pattern Jury Charge 101.4.  However, Reliant lodged no objection below to
the inclusion of this language and has not claimed on appeal that this
instruction was defective because of the inclusion of this phrase.

 





[29]             As
previously noted, Reliant argues that omissions on the part of Reliant may not
be considered as evidence to support the jury’s finding.  However, because the jury was explicitly
permitted to consider the omissions of Reliant in making its determination, and
there was no objection lodged to this instruction, we must review the sufficiency
of the evidence in light of the instruction actually given to the jury.  See
Romero, 166 S.W.3d at 220–21; Zimlich,
29 S.W.3d at 71.

 





[30]             Reliant
also contends that we may not consider any actions by Reliant that are
consistent with its actual relationship with Westfield, citing Gaines v. Kelly, 235 S.W.3d 179, 184
(Tex. 2007).  We disagree.  We do not read the cited passage to
constitute a prohibition against considering actions by a principal which are
consistent with its actual relationship with a purported agent in determining
apparent authority.  Rather, the cited
passage simply held, under the facts of that case, that the failure of the
principal to explain to a party that a special agent did not have also some
further additional authority was not conduct from which that party might
reasonably infer further authority than the agent actually possessed.  However, we agree that actions by a principal
that are consistent with its actual relationship with a purported agent,
standing alone, would not suffice to establish apparent authority. 





[31]             In
support of a jury finding under this prong, Cotton Valley points only to the
evidence that Gouge used Reliant’s name in its marketing efforts and observes
that “this is the only evidence in the record on this point.”  We note that there was no specific evidence
that Reliant knew that Gouge used Reliant’s name in its marketing efforts to
Cotton Valley.  While Gouge initially
answered “Yes” when asked about Reliant’s knowledge of his use of the Reliant
name with Cotton Valley, an objection was lodged to the question, the question
was rephrased, and Gouge then answered that he could not recall a specific
conversation with Reliant regarding Cotton Valley prior to the deal being
struck.  Moreover, even if Reliant knew
that Gouge used Reliant’s name in its marketing efforts to Cotton Valley, this
fact alone is not evidence that Reliant “knowingly permitted Westfield to hold
itself out as having authority to
contract on Reliant’s behalf.”

 





[32]             See Elliot Valve Repair Co. v. B.J. Valve &
Fitting Co., 675 S.W.2d 555, 562
(Tex. App.—Houston [1st Dist.]), rev’d on
other grounds, 679 S.W.2d 1 (Tex. 1984); Behring Int’l, Inc. v. Greater Houston Bank, 662 S.W.2d 642, 649
(Tex. App.—Houston [1st Dist.] 1983,
writ dism’d).

 





[33]             See Ames v. Great S. Bank, 672 S.W.2d 447, 450 (Tex. 1984) (considering whether
there was “pattern of conduct” by principal that would establish apparent
agency).





[34]             Reliant
refers us to Sanders v. Total Heat &
Air, Inc., 248 S.W.3d 907 (Tex. App.—Dallas 2008, no pet.).  We find Sanders
distinguishable.  In Sanders, the Dallas Court of Appeals found it unreasonable for a
subcontractor to believe that a general contractor was a homeowner’s agent,
even though the owner had direct dealings with the subcontractor.  In its opinion, the court of appeals held
that “in light of [the subcontactor’s] many years of experience in the
construction industry, his perception that [the general contractor] was an
agent, when the [homeowner twice] told the subcontractor that [the general
contractor] was her general contractor, was not reasonable.” Id. at 917.  The phrase “in light of [the subcontractor’s]
many years of experience in the construction industry,” however, is what
propels the finding of the unreasonableness of the subcontractor’s reliance in Sanders, and distinguishes it from the
case before us.  In the construction
industry, a subcontractor is required (absent an express contract with the
owner) to look to the general contractor for payment, not the homeowner, “even
if ‘the work is done under the direction of and in accordance with the plans
furnished by the owner.’”  Id. at 913 (internal citations
omitted).  Therefore, an owner’s direct
dealings with a subcontractor do not make an owner liable for payment and a
subcontractor may still only look to the general contractor for payment, unless
the subcontractor has an express contract directly with the owner.  Id.;
see also City of Corpus Christi v. Acme
Mech. Contractors, Inc., 736 S.W.2d 894, 898 (Tex. App.—Corpus Christi
1987, writ denied).  Accordingly, in
light of the usual practices of the construction industry, it was not
reasonable for the subcontractor in Sanders
to believe that the general contractor was acting as the homeowner’s agent,
rendering the homeowner liable for payment, simply because the homeowner dealt
directly with the subcontractor, especially in light of the homeowner’s (the
alleged principal) statements directly to the “relying” party confirming the
relationship between the owner and the general contractor.





[35]             Reliant
also argues that the evidence is factually insufficient to support this adverse
jury finding.  However, as adverse jury
findings on which an appellant has the burden of proof are to be reviewed under
a legal‑sufficiency standard, Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989), we do not
address  Reliant’s factual‑sufficiency
contention.





[36]             Reliant
also complains of evidence of a solicitation letter to an unrelated company by
Westfield.  Reliant fails to provide a
specific citation to the record identifying where this evidence was admitted or
where any objection was made to its admission. 
Cotton Valley states that no solicitation letter was admitted and that
there was only evidence that marketing letters were sent out that used
Reliant’s name.  Because no specific
citations were provided identifying this particular challenged evidence, we are
unable to evaluate this complaint and decline to review it.  See Tex. R. App. P. 38.1(i) (brief must contain
appropriate citations to record); Nga Van
Nguyen v. Kosnoski, 93 S.W.3d 186, 188 (Tex. App.—Houston [14th Dist.]
2002, no pet.) (holding that appellate court “has no duty to search a
voluminous record without guidance from [a party] to determine whether an
assertion of reversible error is valid”).